No. 05-249

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 66

IN THE MATTER OF B.B. and J.B.,

     Youths In Need Of Care.

APPEAL FROM:    The District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DN 2003-01,
Honorable Michael C. Prezeau, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Amy N. Guth, Attorney at Law, Libby, Montana (Mother)

            Ann C. German, Attorney at Law, Libby, Montana (Father)

        For Respondent:

            Honorable Mike McGrath, Attorney General; Joslyn M. Hunt, Assistant
Attorney General, Helena, Montana

            Bernard G. Cassidy, County Attorney; James D. Reintsma, Deputy
County Attorney, Libby, Montana

            Scott B. Spencer, Attorney at Law, Libby, Montana (Guardian ad Litem)

Submitted on Briefs:  October 19, 2005

Decided:  April 11, 2006

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellants J.B. and B.B., parents of j.b. and b.b., youths in need of care, appeal from the order of the Nineteenth Judicial District Court terminating their parental rights. Appellants argue procedural errors deprived them of due process. We affirm.

¶2 We consider the following issues on appeal:

¶3 (1) Did J.B. and B.B., by stipulation, relieve the District Court of the need to hold a separate dispositional hearing pursuant to § 41-3-438, MCA?

¶4 (2) Does the District Court's failure to hold a permanency plan hearing pursuant to § 41-3-445, MCA, require reversal of the order terminating J.B.'s and B.B.'s parental rights?

¶5 (3) Did the District Court err in finding that J.B. suffers from a conduct or condition that renders her unfit to parent that is unlikely to change within a reasonable time pursuant to § 41-3-609, MCA?

## BACKGROUND

¶6 After a series of illegal drug and assault incidents involving J.B. and B.B. in 2002, Deputy County Attorney Robert Slomski, on behalf of the Department of Public Health and Human Services (Department), petitioned the District Court for Emergency Protective Services and Temporary Investigative Authority to protect J.B. and B.B.'s two young children, j.b. and b.b.[1] The District Court granted the petition on January 10, 2003, set a date for a show-cause hearing, and further granted the Department authority to

---

[1]The children's initials are the same as those of their parents. As such, the children will be referred to herein by use of lower case initials.

remove the children from J.B. and B.B.'s (Appellants) home. The Department thereafter took custody of the children, and placed them in the care of their grandmother.

¶7 On April 17, 2003, after J.B. failed to complete her court-ordered drug treatment plan, and upon social worker Marquita Peterson's (Peterson) determination that B.B. was unable to appropriately care for the children, the Department petitioned the District Court to have b.b. and j.b. adjudicated youths in need of care under § 41-3-437, MCA (2001). The District Court held a hearing on the petition on April 28, 2003, in which the following discussion took place:

> THE COURT: And the Petition requests me to adjudicate your children as youths in need of care and to award temporary legal custody to the Department. And is that something that the two of you oppose?
>
> [B.B.]: In part, Your Honor. . . . Marquita has mentioned on numerous occasions that within 30 days we would have our children back after today. If that's the case we do not oppose this. You know, as far as if [J.B.] and myself follow the guidelines that you have set forth in the Petition, the Treatment Plan.
>
> . . . .
>
> MR. CASSIDY [Deputy County Attorney]: Your Honor, if the parents aren't objecting to the Court finding the youths as youths in need of care and signing a treatment plan, I think if we were to have Ms. Peterson testify to some of the history and where we are at with this case, then that would suffice as an adjudicatory hearing.
>
> THE COURT: All right.

After the hearing, each parent signed a treatment plan and undertook to complete the tasks set forth therein. Furthermore, the District Court issued an order adjudicating j.b. and b.b. youths in need of care.

3

¶8     After the parents showed improvement, the Department returned j.b. and b.b. to

their care on June 11, 2003. However, approximately three and a half months later, the

Department learned of continued drug use on the part of both J.B. and B.B. As a result,

the Department immediately removed the children from Appellants' care for the second

time and moved the District Court for an extension of its temporary legal custody of j.b.

and b.b. A hearing regarding that motion was held on October 27, 2003.

¶9     At the October 27, 2003 hearing, Marquita Peterson expressed her desire to give

J.B. and B.B. another opportunity to successfully complete treatment, and therefore

recommended only an extension of temporary legal custody. Though the county attorney

ultimately acquiesced in that course of action, he expressed concern at the hearing,

questioning whether the continued drug use and failed treatment plans did not instead

warrant a proceeding to terminate parental rights. Despite the county attorney's concern,

and given that J.B. and B.B. did not object to the motion to extend temporary legal

custody, the court granted the motion to extend temporary legal custody on November 3,

2003. However, at the close of the October 27, 2003 hearing, the District Court

cautioned J.B. and B.B. that their continued failure to complete treatment would have

consequences:

> THE COURT: . . . But I just want you [J.B. and B.B.] to be aware the
> reason we are appointing an attorney for you at this time is we are coming
> to an end of that period where we are going to keep giving you another six
> months, and another six months, and another six months. And so you need
> to be aware that when we come back to Court in six months, I'm either
> going to get a report from Ms. Peterson that says, boy, these parents have
> shaped up . . . [o]r she's going to tell me these people messed up again, and
> it is time to bring some permanency in these children's lives, and we need

4

to talk about terminating parental rights. That is what is at stake here. Do both of you understand that? [B.B.]?

[B.B.]: Yes, I do, Your Honor.

THE COURT: And [J.B.]?

[J.B.]: Yes.

. . . .

THE COURT: All right. Well, I want you to succeed and Ms. Peterson wants you to succeed. But understand I'm not going to have your children hanging out there in limbo forever until you people get your act together. I mean you've had enough time and now's the time to put your money where your mouth is. . . . [G]ood luck to both of you.

¶10 Following the October 27, 2003, hearing and subsequent order, J.B. and B.B. again showed improvement and the Department returned the children to Appellants on January 15, 2004. However, as had happened previously, both parents began using illegal drugs again, and that, coupled with B.B.'s incarceration for a parole violation, required the Department to retake custody of j.b. and b.b. The children were removed from Appellants' residence on March 26, 2004.

¶11 After retaking the children, the Department again moved to extend temporary legal custody on April 7, 2004. Despite what the court had said at the October 2003 hearing about it being the Appellants' last chance, it again acquiesced, and granted the motion to extend temporary legal custody for a third time on April 29, 2004. The Department had not moved to terminate parental rights.

¶12 Because J.B. again showed signs of improvement, the Department returned j.b. and b.b. to J.B.'s care on May 1, 2004. Unfortunately, however, the Department removed

5

the children for the fourth time just one month later, after finding that J.B. was sick, still using drugs, and had left the children with friends and family who could no longer support their needs. B.B. was still incarcerated, and, having failed a Connections Corrections Program, had been transferred to Montana State Prison in Deer Lodge. The Department determined at that time that there was no further hope that either parent could capably provide for the children. As a result, it petitioned the District Court for permanent legal custody and termination of parental rights on September 15, 2004.

¶13 The District Court scheduled a termination hearing on October 18, 2004. However, at that hearing B.B. joined a motion by J.B. to continue the proceedings and to dismiss for procedural errors. The District Court granted the continuance, but did not dismiss, and further rescheduled the termination hearing for November 17, 2004. The day before the hearing, the Department moved to vacate the termination hearing and set a dispositional hearing, arguing that Appellants had not been afforded due process because a separate dispositional hearing required by § 41-3-438, MCA (2001), had not been held after the court adjudicated j.b. and b.b. youths in need of care on April 28, 2003. The court, however, denied the Department's motion November 17, 2004, and ultimately reset the termination hearing for January 20, 2005.

¶14 On January 19, 2005, J.B. objected to the impending termination hearing on the grounds that (1) the court had failed to hold an adjudicatory hearing following the show-cause hearing within ninety days as required by § 41-3-437, MCA; (2) the court had failed to conduct a separate dispositional hearing following the April 2003 hearing as

6

required by § 41-3-438, MCA; and (3) the court had failed to hold a permanency plan hearing as required by § 41-3-445, MCA. Objections pending, the court held the termination hearing the next day as scheduled, and B.B. orally joined J.B.'s objections at that time. Thereafter, on January 25, 2005, the District Court denied J.B.'s motions, and issued its findings of fact and conclusions of law terminating J.B.'s and B.B.'s parental rights, and granting permanent legal custody of j.b. and b.b. to the Department. In its conclusions of law, the District Court made a finding that J.B. and B.B. had failed appropriate treatment plans and were unfit to parent and unlikely to change under § 41-3-609, MCA.

¶15    J.B. appealed to this Court on February 4, 2005, and B.B. joined that appeal on March 2, 2005. They both appeal the District Court's failure to hold separate dispositional and permanency plan hearings, and J.B. further appeals the District Court's finding that she is unfit to parent under § 41-3-609, MCA.

## STANDARD OF REVIEW

¶16    This Court reviews a District Court's order terminating parental rights to determine whether the District Court abused its discretion. *In re D.B.*, 2004 MT 371, ¶ 29, 325 Mont. 13, ¶ 29, 103 P.3d 1026, ¶ 29. "A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or exceeding the bounds of reason resulting in substantial injustice." *In re D.B.*, ¶ 29.

7

¶17 We review a district court's findings of fact supporting termination of parental rights to determine whether they are clearly erroneous. *In re D.B.*, ¶ 30. We review a court's conclusions of law to determine if they are correct. *In re D.B.*, ¶ 30.

¶18 Finally, this Court has stated that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12 (citations omitted). "Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights." *In re A.M.*, 2001 MT 60, ¶ 34, 304 Mont. 379, ¶ 34, 22 P.3d 185, ¶ 34; *In re J.N.*, ¶ 12.

## DISCUSSION

***Did J.B. and B.B., by stipulation, relieve the District Court of the need to hold a separate dispositional hearing pursuant to § 41-3-438, MCA?***

¶19 J.B. and B.B. argue that the District Court, in failing to hold a separate dispositional hearing after adjudicating j.b. and b.b. youths in need of care, violated § 41-3-438, MCA (2001). That provision generally requires "a dispositional hearing that is separate from the adjudicatory hearing under 41-3-437." Section 41-3-438(2), MCA (2001). However, not only can a dispositional hearing take place in a bifurcated manner *immediately* after an adjudicatory hearing pursuant to § 41-3-438(2)(b), MCA, if the appropriate information is available, but the hearing may also be dispensed with altogether by stipulation pursuant to §§ 41-3-434 and 41-3-438(1), MCA:

> **41-3-438. Disposition – hearing – order.** (1) Unless a petition is dismissed *or unless otherwise stipulated by the parties pursuant to 41-3-434* or ordered by the court, a dispositional hearing must be held on every

8

petition filed under this chapter within 20 days after an adjudicatory order has been entered under 41-3-437.

Section 41-3-438(1), MCA (2001) (emphasis added). Section 41-3-434, MCA (2001), in turn, reads:

> **41-3-434. Stipulations.** Subject to approval by the court, a parent may stipulate to any of the following:
> (1) the child meets the definition of a youth in need of care by the preponderance of the evidence;
> (2) a treatment plan, if the child has been adjudicated a youth in need of care; or
> (3) the disposition.

¶20 Both J.B. and B.B. were present at an initial hearing on the Department's petition for adjudication of j.b. and b.b. as youths in need of care and for temporary legal custody on April 28, 2003. At the hearing, the following conversation took place.

> THE COURT: And the Petition requests me to adjudicate your children as youths in need of care and to award temporary legal custody to the Department. And is that something that the two of you oppose?
>
> [B.B.] In part, Your Honor. If you mind me speaking. Marquita [social worker] has mentioned on numerous occasions that within 30 days we would have our children back after today. If that's the case we do not oppose this. You know, as far as if [J.B.] and myself follow the guidelines that you have set forth in the Petition, the Treatment Plan. It was just never written and signed anywhere is the only thing that we have problems with.
>
> THE COURT: Okay. My guess is that Ms. Peterson would not tell me that that's an iron clad guarantee. So there is a – there is a treatment plan here that has been reviewed and meets with everyone's approval, is that right?
>
> MR. CASSIDY [Deputy County Attorney]: That's my understanding, Your Honor. I think that Ms. Peterson has indicated that if the parents were following the conditions of the treatment plan within 30 days, and if they actually have been doing well, she, at that point, would be placing the children back in their home.

9

. . . .

THE COURT: So then let me ask you first, [B.B.]. Do you – well, let me see. Do you agree that the circumstances which led to the need for this treatment plan established that your children are youths in need of care?

[B.B.]: Yes, I do. As far as --. I agree with the treatment plan. I don't have any problems following the treatment plan.

THE COURT: Okay. Mr. Cassidy, do you think that, I mean, are we going to need to set an adjudicatory hearing in this case?

MR. CASSIDY: Your Honor, if the parents aren't objecting to the Court finding the youths as youths in need of care and signing a treatment plan, I think if we were to have Ms. Peterson testify to some of the history and where we are at with this case, then that would suffice as an adjudicatory hearing.

THE COURT: All right.

¶21    After the April 28, 2003, hearing, the District Court, in accordance with the hearing testimony, issued an order adjudicating j.b. and b.b. youths in need of care and granted temporary legal custody to the Department. Neither J.B. nor B.B. objected to that order. In fact, both parents complied with the order; each signed a treatment plan governing future conduct and submitted it to the court. The plans, among other things, concerned drug treatment and family counseling. J.B.'s and B.B.'s actions after the District Court's order were only consistent with their having agreed (1) to their children being adjudicated youths in need of care, (2) to follow their respective treatment plans, and (3) to give the Department temporary legal custody of their children.

¶22    It was not until a year and a half had passed that the Department and Appellants, the Department in November of 2004 and Appellants in January of 2005, objected to the

District Court's failure to hold a separate dispositional hearing pursuant to § 41-3-438, MCA (2001), and moved the court to vacate the then pending termination hearing. Appellants' objection was made over a year after counsel was appointed for them. The District Court denied those motions. Relying on the April 28, 2003, hearing colloquy, it ruled that J.B. and B.B. had stipulated (1) to their children being adjudicated youths in need of care, (2) to the contents of treatment plans, and (3) to the Department being granted temporary legal custody over j.b. and b.b. As a result, the court ruled that it was not required to hold a separate dispositional hearing pursuant to § 41-3-438(1), MCA (2001).

¶23 Even if we were to conclude that the parties' long delay in raising their objection did not waive it, § 41-3-438(1), MCA, does not require a separate dispositional hearing if stipulations are entered pursuant to § 41-3-434, MCA. That is the case here. At the April 28, 2003, hearing, J.B. and B.B. agreed (1) to have their children adjudicated youths in need of care, (2) to sign and abide by treatment plans, and (3) to allow the Department temporary legal custody of their children. The Court asked J.B. and B.B. quite clearly,

> THE COURT: And the Petition requests me to adjudicate your children as youths in need of care and to award temporary legal custody to the Department. And is that something that the two of you oppose?

B.B., on behalf of both himself and J.B., answered:

> [B.B.]: In part, Your Honor. If you mind me speaking. Marquita [social worker] has mentioned on numerous occasions that within 30 days *we* would have *our* children back after today. If that's the case *we do not oppose this.* You know, as far as if *[J.B.] and myself* follow the guidelines that you have set forth in the Petition, the Treatment Plan. It was just never written and signed anywhere is the only thing that *we* have problems with.

11

(Emphasis added.) It is evident from this dialogue that B.B. was speaking for both J.B. and himself and stipulating to not only their children being adjudicated youths in need of care, but to the Department being awarded temporary legal custody, a dispositional issue. Thereafter, both J.B. and B.B. acted precisely in conformity to the representations made at the hearing. Neither expressed concerns about their children being adjudicated youths in need of care or to the Department's exercise of temporary legal custody over them. Both signed treatment plans, began drug and alcohol treatment programs, and attended family counseling sessions. In sum, both J.B. and B.B. acted in every way as if they had stipulated to the adjudication and the disposition at the hearing, and thereafter pursued their treatment plans in accordance with such a stipulation.

¶24 After J.B. and B.B. stipulated to their children being adjudicated youths in need of care, to their children being placed in the temporary legal custody of the Department, and to signing treatment plans, the District Court did not thereafter hold a separate dispositional hearing. This is not surprising; that hearing would have been unnecessary given that both J.B. and B.B. had already stipulated to the pertinent dispositional issues. For that reason, we hold that the District Court did not violate § 41-3-438(1), MCA (2001), when it did not schedule a separate dispositional hearing.

***Does the District Court's failure to hold a permanency plan hearing pursuant to § 41-3-445, MCA, require reversal of the order terminating J.B's. and B.B.'s parental rights?***

¶25 Section 41-3-445(1)(a)(i), MCA (2001), requires a court to hold a permanency plan hearing,

12

(A) within 30 days of a determination that reasonable efforts to provide preservation or reunification services are not necessary under 41-3-423, 41-3-438(6), or 41-3-442(1); and

(B) no later than 12 months after the initial court finding that the child has been subjected to abuse or neglect or 12 months after the child's first 60 days of removal from the home, whichever comes first.

The purpose of the permanency plan hearing is to "assure that children taken into protective custody by the DPHHS do not languish in foster care or fall through the proverbial administrative crack." *In re A.R.*, 2004 MT 22, ¶ 21, 319 Mont. 340, ¶ 21, 83 P.3d 1287, ¶ 21. In the matter before us, both sides agree that a permanency plan was not held within the time limits of the statute. J.B. and B.B., in turn, argue that failure to hold a permanency plan hearing violated their rights to due process. For the following reasons, however, we hold that the District Court's failure to hold a permanency plan hearing did not violate J.B.'s and B.B.'s due process rights, because the process that J.B. and B.B. received was fair, and because the purposes of a permanency plan were achieved.

¶26 This case is similar to *In re A.R.*, where we held that the District Court's failure to hold a permanency hearing, though disappointing, was not fundamentally unfair under the circumstances and therefore did not violate the parents' due process rights. *In re A.R.*, ¶ 23. In that case, the failure to hold the permanency plan hearing was not unfair because the Department was "actively working with both biological parents in an attempt to reunify the children with one of them." *In re A.R.*, ¶ 21. Because of the Department's efforts there, we concluded that the children were "not destined to languish in foster

13

care," and therefore further concluded that the purposes of the permanency plan hearing had been achieved. *In re A.R.*, ¶ 22.

¶27 The reasoning of *In re A.R.* is applicable to the case before us. Here, though the court never held a permanency plan *per se*, the purposes served by such a hearing were nevertheless met. The court knew from the testimony of social worker Marquita Peterson that the Department was actively trying to reunite J.B. and B.B. with their children. The court had evidence of those efforts; three times it supervised the return of the children to J.B. and B.B.'s home. Furthermore, the court, on October 27, 2003, explained to both J.B. and B.B. the importance of permanently placing the children in a safe and secure home.

> THE COURT: . . . But I just want you [J.B. and B.B.] to be aware the reason we are appointing an attorney for you at this time is we are coming to an end of that period where we are going to keep giving you another six months, and another six months, and another six months. And so you need to be aware that when we come back to Court in six months, I'm either going to get a report from Ms. Peterson that says, boy, these parents have shaped up . . . [o]r she's going to tell me these people messed up again, and it is time to bring some permanency in these children's lives, and we need to talk about terminating parental rights. That is what is at stake here. Do both of you understand that? [B.B.]?
>
> [B.B.]: Yes, I do, Your Honor.
>
> THE COURT: And [J.B.]?
>
> [J.B.]: Yes.
>
> . . . .
>
> THE COURT: All right. Well, I want you to succeed and Ms. Peterson wants you to succeed. But understand I'm not going to have your children hanging out there in limbo forever until you people get your act together. I

14

mean you've had enough time and now's the time to put your money where your mouth is. . . . [G]ood luck to both of you.

In this interaction, the District Court specifically referenced permanency for the children and made observations meant to insure that everyone understood that the children could not "languish" in the system. This is typical of discussion that would normally occur at a permanency plan hearing. *See* § 41-3-445(6), MCA (2001). For that reason, we are confident, as we were in *In re A.R.*, that "had a permanency plan hearing been held, it undoubtedly would have formalized DPHHS'[s] goal of reunifying these children with [their parents]." *In re A.R.*, ¶ 22. The record here, including the Department's repeated efforts to reunite the children with their parents, clearly demonstrates the Department's reunification goal.

¶28 Based on the above, we hold that the District Court's failure to hold a permanency plan hearing pursuant to § 41-3-445, MCA (2001), was not fundamentally unfair to J.B. and B.B., and therefore, the omission did not violate their rights to due process.

***Did the District Court err in finding that J.B. suffers from a conduct or condition that renders her unfit to parent that is unlikely to change within a reasonable time pursuant to § 41-3-609, MCA?***

¶29 As provided in § 41-3-609, MCA (2001), a court may consider ordering the termination of the parent-child legal relationship only if it makes one of several requisite findings. Here, in its order terminating J.B.'s parental rights, the District Court entered such a finding that "the conduct or condition of the parents which render them unfit to care for their children is unlikely to change within a reasonable period of time." This finding, if true, supports a subsequent termination of parental rights if (1) the child at

15

issue has been adjudicated a youth in need of care, and (2) the parent has failed to comply with a court-approved treatment plan. *See* § 41-3-609(1)(f), MCA (2001). As noted above, both j.b. and b.b. were adjudicated youths in need of care on April 28, 2003. Furthermore, J.B. failed to comply with court-approved treatment plans on three occasions.

¶30　　As mentioned above, we review a district court's findings of fact supporting termination of parental rights to determine whether they are clearly erroneous. *In re D.B.*, ¶ 30. "A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake." *In re M.A.E.*, 1999 MT 341, ¶ 17, 297 Mont. 434, ¶ 17, 991 P.2d 972, ¶ 17. Here, J.B. argues that the District Court's finding that "the conduct or condition of the parents which render them unfit to care for their children is unlikely to change within a reasonable period of time" is clearly erroneous with respect to her. In support, she cites her recent sobriety and the testimony of both her chemical dependency counselor and the Director of Homeward Bound, in which each stated their belief that she could kick her addiction.

¶31　　In finding J.B. unfit to parent and unlikely to change, the District Court cited J.B.'s long-term drug use and repeated failed attempts to complete treatment. It further stated:

> Even under threat of losing their children . . . the parties returned to drug
> use again and again. J.B. has been in treatment a dozen times by her own

16

estimate, and she has always returned to using drugs. In view of her terrible record of drug abuse going back nearly 30 years, it would be a foolish gamble to place any confidence in J.B.'s prospects for long-term sobriety.

J.B.'s drug history was well documented in the termination proceedings. Furthermore, by the January 20, 2005, termination hearing, the District Court had itself already witnessed J.B. fail three different court-approved treatment plans. In light of that evidence, and in consideration of our above articulated standard of review, we must conclude that the District Court's finding that J.B. was "unfit to parent and unlikely to change" was based on substantial evidence which in no way misapprehended the evidence. As we have held, "our starting point is whether the finding is supported by substantial evidence. . . . We do not substitute our judgment regarding the weight to be given to the evidence for that of the trial court; nor do we review the record to determine whether evidence would support a different finding." *In re T.A.G.*, 2002 MT 4, ¶ 10, 308 Mont. 89, ¶ 10, 39 P.3d 686, ¶ 10. As such, we conclude that the District Court's finding was not clearly erroneous as a matter of law. The court had already given J.B. numerous chances, and had to, in the end, do what was in the best interests of the children. *See* § 41-3-101(4), MCA (2001).

¶32    Affirmed.


/S/ JIM RICE


17

We concur:

/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ THOMAS C. HONZEL
Honorable Thomas C. Honzel, District
Judge, sitting in place of Justice Brian Morris

Justice W. William Leaphart dissenting.

¶33    I would reverse as to J.B. for the reason that B.B., who purported to be speaking

on behalf of himself and J.B., is not an attorney and had no authority to speak for J.B.

*See* § 37-61-210, MCA, and *Weaver v. Law Firm of Graybill, et al.* (1990), 246 Mont.

175, 178, 803 P.2d 1089, 1091.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson dissents.

¶34    I dissent from our Opinion.  Specifically, for two reasons, I cannot agree with our

analysis and disposition of Issue One.

¶35    First, as the colloquy cited indicates, when they "stipulated" that their children be

adjudicated youths in need of care and that the Department have temporary legal custody,

B.B.'s and J.B.'s understanding was that they would get their children back in thirty days.

While the Court points to various qualifiers stated by the County Attorney and the trial

18

court that this was not an "iron clad" guarantee, I am not persuaded that the two parents, untrained in the law, actually and fully appreciated the seriousness of their "stipulation" and the rights and statutory protections they were giving up. In point of fact, when the District Court asked B.B. and J.B. if they opposed the Department's request for temporary custody and adjudication of the children as youths in need of care, B.B. immediately responded "*In part*, Your Honor." (Emphasis added.) B.B. then proceeded to condition his "stipulation," in plain language, with the assumption that he and J.B. would have their children back within thirty days, stating "*If* that's the case we do not oppose this." (Emphasis added.)

¶36   My second disagreement follows from the first. As noted in ¶ 18 of the Court's Opinion, a natural parent's right to the care and custody of his or her child is a fundamental liberty interest. This interest cannot be adequately protected where natural parents are forced to make decisions which may adversely and irrevocably affect their fundamental right to parent without adequate, effective assistance of counsel. *See In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12. Here, at the time they stipulated away their rights and statutory protections, neither B.B. nor J.B. were represented by counsel. It is small wonder that their understanding that they would get their children back in thirty days was misplaced. Finally, along these same lines, the Court states that B.B. was speaking for and representing J.B.'s interests in this matter. However, B.B. is not an attorney, and had no authority to speak for or represent J.B. in

19

the proceedings which the State brought against her. *See* § 37-61-210, MCA; *Weaver v. Law Firm of Graybill, et al.* (1990), 246 Mont. 175, 178, 803 P.2d 1089, 1091.

¶37    For the foregoing reasons, I would reverse.  I dissent.


/S/ JAMES C. NELSON


Chief Justice Karla M. Gray joins in the dissent of Justice James C. Nelson.


/S/ KARLA M. GRAY