DA 10-0092

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 176N

IN THE MATTER OF:

T.H.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DN 08-17
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Elizabeth Thomas, Attorney at Law, Missoula, Montana

        Joseph P. Howard, Attorney at Law, Great Falls, Montana

    For Appellee:

        Steve Bullock, Montana Attorney General; Mardell Ployhar, Assistant
Attorney General, Helena, Montana

        Brett D. Linneweber, Park County Attorney, Livingston, Montana

Submitted on Briefs:  June 23, 2010

Decided:  August 17, 2010

Filed:

_____
                  Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d)(v), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, the following memorandum decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 The Sixth Judicial District Court, Park County, terminated the parental rights of R.H. and A.G, the parents of T.H. R.H. and A.G. appeal. We affirm. The issues on appeal are whether the District Court erred by not strictly following statutory requirements and whether the District Court abused its discretion when it terminated R.H.'s and A.G.'s parental rights.

¶3 On December 1, 2008, when T.H. was approximately four months old, T.H.'s mother, A.G., brought T.H. to the emergency room in Livingston because T.H. had not been moving her right leg. An x-ray revealed that T.H.'s femur was broken. Dr. Peggy O'Hara, the emergency room physician, suspected that the fracture had been caused by child abuse, so she contacted the Department of Public Health and Human Services (DPHHS). Because of her suspicions, Dr. O'Hara took more x-rays, which revealed that T.H. had two broken ribs and a broken clavicle.

¶4 On December 5, DPHHS filed a petition for immediate protection and emergency services for adjudication as a youth in need of care and for temporary legal custody. The District Court granted immediate protection and emergency protective services and scheduled a show cause hearing on the petition for adjudication.

2

¶5   Prior to the show cause hearing, Gail McCormick, the court appointed guardian ad litem, filed a detailed report, in which she concluded:

[There is] great cause for concern for the safety of this child in the immediate family environment. No one in the family is taking any responsibility for the injuries inflicted upon this baby, and obviously no one protected this baby from this neglect and abuse. I am especially concerned about the time lapse in getting medical help when the baby could not use her right leg . . . . If we don't take appropriate actions now for the protection of this child, she could suffer permanent disability or death.

¶6   On January 6, 2009, the District Court held a show cause hearing at which both parents stipulated that T.H. was a youth in need of care. A dispositional hearing was scheduled for March 10.

¶7   On March 6, DPHHS filed a petition for termination of parental rights. In the petition, DPHHS moved for termination, alleging T.H.'s parents abused and neglected her chronically and severely, committed aggravated assault, and committed neglect that resulted in serious bodily injury or death—all conditions for termination under § 41-3-609(1)(d), MCA. In its petition, DPHHS noted that the parents had stipulated to adjudication of T.H. as a youth in need of care and asserted it had obtained medical findings that showed T.H. had been abused and neglected. DPHHS also stated: "No further efforts for reunification with respect to the parents and the youth are necessary or in the best interests of the youth."

¶8   The petition contained an affidavit from a DPHHS social worker, who stated that T.H.'s injuries were consistent with child abuse and that T.H.'s supervised contacts with her parents did not go well because the parents did not exhibit remorse or sadness about the child's injuries. She concluded that a treatment plan would not be successful because the

3

parents had severely neglected and chronically abused T.H. and because they refused to admit that they had caused her injuries or neglected her.

¶9 The District Court filed an order vacating the disposition hearing and setting a hearing on the State's petition for termination of parental rights. The court ordered that no further efforts for reunification were necessary or in the best interests of the youth pending a hearing on the matter.

¶10 Several witnesses testified at the hearing on the petition to terminate R.H.'s and A.G.'s parental rights, including A.G. and R.H. A.G. testified that she noticed that T.H. was having problems with her leg on the evening of November 29. She decided to wait to take T.H. to the emergency room because although T.H.'s leg appeared slightly swollen, A.G. wanted to see if T.H.'s leg would improve. A.G. admitted that she did not think that T.H.'s leg was fractured by being wrapped up in a blanket, like she originally told the social worker at the hospital. A.G. said she had no knowledge of T.H.'s other fractures until they were discovered on an x-ray.

¶11 R.H. testified that he noticed a change in T.H.'s behavior on the night of November 29 when T.H. did not seem to be kicking her right leg. He did not notice any swelling in T.H.'s leg. R.H. testified that he and A.G. waited until Monday to take T.H. to the emergency room because on Sunday, T.H. appeared to be kicking her leg slightly.

¶12 The DPHHS social workers testified about their observations of the interactions between T.H. and her parents at the emergency room and on supervised visits. They testified that T.H.'s health, welfare, and safety were adversely affected due to numerous incidents of

physical abuse and severe medical neglect; T.H. would be in danger of being abused or neglected if she was returned to her parents; A.G. and R.H. did not meet T.H.'s physical, psychological, or medical needs; A.G. and R.H. were grossly negligent; A.G. and R.H. committed psychological abuse and neglect; and, aggravated circumstances listed in § 41-3-423(2)(a), MCA, including torture, chronic abuse, severe neglect, and aggravated assault had been established. The social workers also testified that neither parent had accepted any responsibility for T.H.'s injuries, thus they were unlikely to change within a reasonable time. They said termination of R.H.'s and A.G.'s parental rights was in T.H's best interest because the risk of T.H. dying if she was returned to her parents' care was too great.

¶13 A police detective testified that he had interviewed both of the parents separately and neither parent was able to provide him with a plausible explanation for T.H.'s injuries. Dr. Mark Schulein, T.H.'s pediatrician, testified that he had seen T.H. for three wellness checks while she was in her parents' care. At the last wellness check, Dr. Schulein was concerned that T.H. was not gaining enough weight and said she was suffering from mild failure to thrive.

¶14 Dr. Jeffrey Scott Prince, a pediatric radiologist, reviewed T.H.'s x-rays and testified that T.H. had undergone at least two different episodes of injury. He testified that the femur fracture was approximately ten days old, rather than three days old as the parents had claimed. He said that a femur is a very strong bone that could only be fractured with a high degree of force. Dr. Prince testified that the rib and clavicle fractures were approximately three weeks old and were extremely uncommon in children. He testified that T.H.'s fractures

5

would have been very painful, and it would have been obvious to her caregivers that she was exhibiting the symptoms of pain. Dr. Prince concluded that T.H.'s injuries were not consistent with accidental injuries and were consistent with abuse.

¶15 Dr. O'Hara testified that T.H. appeared to be in distress during her initial examination at the emergency room. She concluded that none of the explanations A.G. and R.H. had provided for T.H.'s injuries were plausible, and that T.H.'s fractures had been caused by abuse. She concluded that the parents' failure to seek medical attention for the fractures constituted medical neglect.

¶16 Dr. Karen Mielke, a child abuse specialist, testified that rib fractures like T.H.'s are very uncommon and almost always caused by shaking. She explained that the fracture of the clavicle would have been caused by a direct blow to the shoulder. Dr. Mielke concluded that T.H. had suffered from failure to thrive and medical neglect when she was in her parents' care; her injuries were caused by chronic child abuse; T.H. was likely shaken by one of her parents; and T.H. did not receive the level of care needed by her parents. She concluded that T.H. faced "significant risk of serious bodily injury or death" if she was returned to her parents. Finally, McCormick, the guardian ad litem, testified that A.G. and R.H.'s parental rights should be terminated.

¶17 The District Court issued findings of fact, conclusions of law, and an order terminating parental rights. The District Court found: the fractures would have been painful and observable to a care provider; the parents' delay in seeking medical attention for each of T.H.'s injuries constituted chronic, severe neglect and abuse; the parents delayed seeking

6

medical attention because they hoped evidence of the injuries would subside; T.H.'s fractures were caused by physical abuse; and the parents never provided a reasonable explanation for T.H.'s injuries or showed any remorse. Based on these findings, the District Court concluded that the parents had subjected T.H. to aggravated circumstances which constitute chronic abuse and chronic, severe neglect, which are grounds to terminate parental rights under §§ 41-3-609(1)(d) and 41-3-423(2)(a), MCA.

¶18 On appeal, R.H. and A.G. argue that the District Court failed to follow statutory requirements and violated their right to a fundamentally fair procedure in three ways: (1) it violated their due process rights by failing to hold an adjudicatory hearing that met the requirements of §§ 41-3-437 and 41-3-438, MCA, specifically failing to issue a written order[1] and failing to hold a dispositional hearing; (2) it determined that reunification efforts were not necessary without holding a hearing as is required by § 41-3-423(5), MCA[2]; and, (3) it based its termination of parental rights on insufficient findings not supported by clear and convincing evidence as is required by § 41-3-609(1)(d), MCA.

¶19 A district court's findings are clearly erroneous if they are not supported by substantial evidence, if the district court misapprehended the evidence, or if we come away from our review with a definite and firm conviction that the district court made a mistake.

---

[1] R.H. and A.G. failed to object to the lack of written findings. We will not address this argument. A party must notify the court at the time the objectionable conduct is at issue to properly preserve an issue for appeal. *In the Matter of A.T.*, 2006 MT 35, ¶ 15, 331 Mont. 155, 130 P.3d 1249.

[2] R.H. and A.G. failed to object to the lack of hearing for the finding that reunification efforts were not necessary. We will not hear arguments on appeal for alleged errors that the district court did not have an opportunity to correct. *In the Matter of D.H.*, 2001 MT 200, ¶ 41, 306 Mont. 278, 33 P.3d 616.

*Interstate Production Credit v. DeSaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991). Because parental rights are a fundamental liberty interest, an order terminating these rights must be supported by clear and convincing evidence. *In re Adoption of K.P.M.*, 2009 MT 31, ¶ 10, 349 Mont. 170, 201 P.3d 833; *See* § 41-3-609(1), MCA. The three part *DeSaye* test is used to determine if a finding of fact is clearly erroneous in a case where clear and convincing evidence is the standard of proof. *K.P.M.*, ¶ 10. We review a district court's order terminating parental rights for an abuse of discretion. *In the Matter of J.C.*, 2008 MT 127, ¶ 33, 343 Mont. 30, 183 P.3d 22.

¶20    Upon the filing of a petition, an adjudicatory hearing must be held to determine if the minor is a youth in need of care. Section 41-3-437, MCA. Parties may stipulate to whether the child meets the definition of a youth in need of care. Section 41-3-434(1), MCA. A dispositional hearing must be held within 20 days after an adjudicatory order has been entered, unless the petition is stipulated to by the parties. Section 41-3-438(1), MCA; *In the Matter of B.B.*, 2006 MT 66, ¶ 23, 331 Mont. 407, 133 P.3d 215.

¶21    The District Court may terminate a parent-child relationship upon a finding established by clear and convincing evidence that the parent has subjected a child to any of the circumstances listed in § 41-3-423(2)(a) or (c), MCA, which includes chronic abuse, chronic and severe neglect, or committing aggravated assault against a child. Section 41-3-609(1)(d), MCA.

¶22    We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our 1996 Internal Operating Rules, as amended in 2006, which provides for memorandum

opinions. It is manifest on the face of the briefs and the record before us that the appeal is without merit because the legal issues are controlled by settled Montana law. R.H. and A.G. stipulated that T.H. met the definition of a youth in need of care, therefore a dispositional hearing was not required under § 41-3-438(1), MCA. *See In re B.B.*, ¶ 33. Moreover, the overwhelming evidence in the record clearly and convincingly supports the District Court's finding that R.H. and A.G. had chronically abused and chronically and severely neglected T.H. It did not abuse its discretion when it terminated their parental rights.

¶23     Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS