No. 03-400

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 22

IN THE MATTER OF A.R. and S.A.R.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and for the County of Yellowstone, Cause No. DN 2001-004
                The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Mark Anderson, Attorney at Law, Billings, Montana

        For Respondent:

        Hon. Mike McGrath, Montana Attorney General, Tammy K Plubell,
        Assistant Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone
        County Attorney, Richard Helm, Deputy County Attorney, Billings, Montana

        For Youths:

        Patrick Kenney, Attorney at Law (Guardian ad Litem), Billings, Montana

                                Submitted on Briefs:  December 23, 2003

                                    Decided:  February 3, 2004

Filed:

        _____
                            Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    S.A. is the biological mother of two minor children, A.R. and S.A.R.  In March 2003, the Thirteen Judicial District Court, Yellowstone County, issued its Order terminating S.A.'s parental rights to both children, and awarded custody of the children to their biological father, L.R.  S.A. appeals.  We affirm.

## ISSUE

¶2    The issue presented on appeal is whether the District Court, the State, and the Department of Public Health and Human Services (DPHHS or the Department) violated S.A.'s Constitutional right to due process.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    S.A. was adjudicated a youth in need of care in 1985 at the age of fourteen.  The DPHHS retained protective custody over her until she turned eighteen in March 1989.  Around that time she married L.R. and in 1991 gave birth to their son, A.R.  In 1993, she bore another son, S.A.R.  In 1994, the Colorado state protective agency received its first report of abuse and neglect in the family.  L.R. left the family around this time and moved to Montana.  S.A. remained in Colorado, where she was subsequently arrested on drug-related charges and the children were placed into temporary foster care.  When the children and S.A. were reunited, they moved to Montana as well.  S.A. and L.R. did not reunite and ultimately were divorced in December 1999.  L.R. took custody of the boys from their arrival in Montana until February 1998, when he relinquished custody.  During this time, S.A. had supervised contact with the children.  Between February 1998 and December 1999,

2

L.R. saw his sons every Sunday.

¶4 S.A. has a history of abusive relationships with men. After L.R. relinquished custody to S.A. in 1998, the Department began receiving reports of abuse, neglect, and drug and alcohol-related problems in the home. Upon investigation, some reports were substantiated while others were not.

¶5 S.A. was involved in a severely physically abusive relationship in 1999. That relationship exposed her sons to extreme violence, threats of violence and physical injury at the hands of both S.A. and her boyfriend at the time. Around August 1999, the children were removed from the home and placed in foster care. Upon contact by the Department, L.R., who had undergone drug and alcohol rehabilitation after returning the children to S.A. in February 1998, said he wanted custody of the boys. The children remained in foster care, however, until they were reunited with S.A. a few months later in December 1999.

¶6 By January 2001, S.A. was involved in another dysfunctional relationship with a live-in partner, M.W. On January 3, M.W., in an alcohol and drug-induced rage, violently assaulted and raped S.A. in the presence of her children, and choked A.R., beat his head against a headboard and threatened to kill him. The Department took the then ten-year old and eight-year old boys into protective custody on or around January 4, 2001, and placed them in foster care. Thereafter, it began working with S.A. in an attempt to reunify her with her children, provided reunification proved to be in the boys' best interests.

¶7 After months of monitored visits between S.A. and her sons, psychological evaluations of S.A., L.R. and the children, and failed treatment plans, the District Court

declared the boys to be "youths in need of care."  It subsequently held a hearing, terminated S.A.'s parental rights, and placed the boys in the custody of L.R. and his wife.  S.A. appeals. We affirm.

## STANDARD OF REVIEW

¶8      Our review of the constitutional issue of due process involves a question of law and, as such, our review is plenary. *See Pickens v. Shelton-Thompson*, 2000 MT 131, ¶ 7, 300 Mont. 16, ¶ 7, 3 P.3d 603, ¶ 7.  *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 17, 306 Mont. 1, ¶ 17, 29 P.3d 485, ¶ 17.

## DISCUSSION

¶9      S.A. claims that as a result of due process violations, the court erred when it terminated her parental rights.  She cites the following examples of due process violations:

1.      the State and the Department failed to hold a permanency plan hearing within the statutorily-required time;

2.      the overall length of the proceeding, including the delay in the availability of the District Court record between the November 2002 bench hearing in which her parental rights were terminated and the record being filed in June 2003; and

3.      the District Court's denial of her request for an independent evaluation, an independent drug test and to videotape her visitation with her sons.

¶10     S.A. makes further due process violation assertions that she does not develop or support with authority in her Brief to this Court; therefore, we decline to address those matters.  Rule 23(a)(4), M.R.App.P.

4

¶11     We note that S.A. is not challenging the District Court's decision to terminate her parental rights. While S.A. summarizes her argument by stating that the District Court erred by terminating her parental rights, her argument is grounded exclusively in claims of due process violations, and therefore we analyze and decide this case on due process grounds. This Court has previously concluded that the phrase "due process" cannot be precisely defined but that the "phrase expresses the requirements of 'fundamental fairness'." *In re A.F.-C.*, 2001 MT 283, ¶ 50, 307 Mont. 358, ¶ 50, 37 P.3d 724, ¶ 50 (citation omitted).

¶12     In evaluating the fundamental fairness of S.A.'s proceeding, we first recognize that S.A. was represented by competent counsel throughout this proceeding and was allowed and encouraged to fully participate in all requirements to regain custody of her children. Moreover, she did not challenge any court rulings throughout this process. We now review S.A.'s individual claims.

¶13     S.A. claims that the State's and the Department's failure to hold a permanency plan hearing within the statutorily-prescribed time resulted in the District Court losing jurisdiction over this matter and required a dismissal. Section 41-3-445(1)(a)(i)(B), MCA, requires that a permanency plan hearing must be held "no later than 12 months after the initial court finding that the child has been subjected to abuse or neglect or 12 months after the child's first 60 days of removal from the home, whichever comes first." The boys were removed from S.A.'s home in early January 2001. It is undisputed that a permanency plan hearing was not held within the statutory time frame.

¶14     Under § 41-3-445(1)(b), MCA, however, a permanency plan hearing is not required if the children have been returned to a biological or adoptive parent, stepparent, or legal guardian.  In this case the children were placed with their biological father on August 22, 2002.  S.A. claims that because the hearing was not held in a timely manner, her due process rights were violated, or in other words, the proceeding was fundamentally unfair.

¶15     We conclude that under the facts of this case, failure to hold the permanency plan hearing within the statutory time frame was not fundamentally unfair and did not warrant dismissal of this action.

¶16     Immediately after the children were removed the S.A.'s custody, attorneys were appointed for both S.A. and L.R., and a guardian ad litem was appointed for the children. While S.A. had obtained a court order at the time of their divorce prohibiting L.R. from visiting with the children, visitation was restored at some time between January 4, 2001, and June 26, 2001.  By June 26, L.R. had already developed a record of regular Friday afternoon visits with his sons.  He had not cancelled or missed any visits up to that date.  He had also verified his attendance and completion of orientation at the Journey Recovery Program and was awaiting an opening in a chemical dependency treatment program.

¶17     On August 24, 2001, L.R. went to DPHHS to meet with the case worker and inquire what else he needed to do in order to get his children returned to his care.  It was apparent to the DPHHS at that time that L.R. wished to regain custody of A.R. and S.A.R. and was actively pursuing that goal.

6

¶18 On September 10, 2001, L.R. met with a DPHHS case worker to discuss a treatment plan that was being developed for him. It included a requirement that he complete a chemical dependency treatment program. He informed the case worker that he had already completed such a program and would provide verification.

¶19 On September 20, 2001, Dr. Chessen, the experienced psychologist who had evaluated S.A., A.R. and S.A.R., evaluated L.R. Dr. Chessen also met with L.R. weekly for approximately six weeks after the evaluation. Dr. Chessen testified at the January 2002 temporary custody hearing that L.R. had scored well on the child abuse test indicating an unlikelihood of abuse. He gave a qualified recommendation that the boys be placed in L.R.'s custody contingent upon family counseling.

¶20 On February 21, 2002, L.R. willingly signed the court-approved treatment plan for the period from February 11, 2002 to August 11, 2002. On August 12, 2002, DPHHS submitted its periodic affidavit, testified that L.R. had successfully completed his treatment plan and recommended that the boys be placed in L.R.'s temporary custody. The boys were placed with their natural father on August 22, 2002.

¶21 While we do not condone DPHHS' failure to petition for the permanency plan hearing within the statutorily-required time period, we conclude that dismissal of this action for failure to hold such a hearing is unnecessarily draconian and not required by the statute. The purpose of a child custody proceeding is to discern what living and custodial arrangement is in the best interests of the children involved. The purpose of the permanency plan hearing is to assure that children taken into protective custody by the DPHHS do not languish in

7

foster care or fall through the proverbial administrative crack. In the case before us, DPHHS was actively working with both biological parents in an attempt to reunify the children with one of them. The Department knew well before March 2002 that the children's natural father was aggressively seeking custody. L.R. was a willing parent seeking custody and conscientiously satisfying the terms of his treatment plan. Moreover, DPHHS, while recognizing that S.A. was not displaying the same level of success with her treatment plans, continued instructing her toward the goal of reunification as well.

¶22 Under these circumstances, had a permanency plan hearing been held, it undoubtedly would have formalized DPHHS' goal of reunifying these children with either S.A. or L.R., depending upon which parent successfully proved to the Department and the court that he or she was adequately prepared to care for these children. Therefore, the children were not destined to languish in foster care. Rather, given the circumstances at the time a permanency plan hearing should have occurred, the plan was that the children would be placed in the custody of either one of their biological parents. We note also that the Department ultimately petitioned for such a hearing in October 2002 and the District Court concluded that such a hearing was unnecessary under § 41-3-445(1)(b), MCA, as the boys had been placed with their father.

¶23 Again, we caution that DPHHS must diligently comply with abuse and neglect statutory requirements, as failure to do so could result in unfortunate and traumatic consequences. Given the particulars of this case, however, because the Department was working closely with two parents living in separate households, both of whom were actively

8

seeking custody, and one of whom subsequently received custody, the failure to hold such a hearing was neither fundamentally unfair nor a violation of S.A.'s due process right.

¶24 S.A. also claims that she was prejudiced by the length of the proceeding. She asserts that her children were removed from her home in early January 2001, and the District Court did not issue its bench ruling until November 2002. She filed her appeal in March 2003, but because the District Court granted an extension of time in which to file the transcripts, such transcripts were not available until June 17, 2003. She argues that this unreasonable period of time violated her rights.

¶25 The State responds that the length of the proceeding was intended, in part, to benefit S.A. DPHHS did not initially move to adjudicate these boys as "youths in need of care," but rather attempted to give S.A. sufficient time to demonstrate her ability to adequately care for her sons. The Department provided regularly-scheduled monitored visits, offered suggestions and advice, encouraged counseling and stressed the importance of successful completion of S.A.'s treatment plans. It was only after all these attempts failed that the Department sought adjudication of the boys as "youths in need of care." The court so decided on April 22, 2002, a full sixteen months after the children were removed from the home.

¶26 DPHHS continued working with S.A., however, for months after the April adjudication. It was not until August 12 that the Department sought termination of S.A.'s parental rights, and then only after it was clear that S.A. failed to satisfy the terms and goals of multiple treatment plans, acted inappropriately during numerous visits with her sons

9

which ultimately resulted in the discontinuation of visits, maintained a combative attitude toward DPHHS, and had "not benefitted from the multitude of services that [had] been offered to her."

¶27 S.A. correctly acknowledges that § 41-3-604(1), MCA, contains the presumption that a child's best interests are served by terminating a parent's rights to the child if the child has been in foster care for fifteen of the past twenty-two months. S.A. claims that because this case took so long, this statutory presumption worked against her and lessened her chances of getting her children back. We disagree. As the record indicates, despite S.A.'s failure to show progress toward reunification goals, after fifteen months the Department was still actively working with her to accomplish those goals. It did not seek termination of her rights until more than twenty months after the children had been removed from her home. Under these circumstances we conclude that the length of time for this proceeding did not prejudice S.A.'s rights.

¶28 We do not fault the District Court for granting the court reporter a single extension of time in which to file the transcripts of the proceeding. Such an extension was authorized by Rule 10, M.R.App.P., and is commonly granted. Moreover, S.A. did not object at the time of this request nor did the extension appear to unduly delay the filing of her appeal with this Court, as her opening brief was not filed until three months after the transcripts were filed.

¶29 S.A. also claims that the court's denial of her request for certain services denied her due process. The record shows, however, that the District Court did not deny S.A. the right

10

to an independent evaluation or an independent drug test; it merely placed the burden of paying for these services on S.A. The court concluded that the State had already paid for one psychological evaluation and for psychological counseling, as well as random drug tests. At the time the psychological evaluation was submitted, S.A. had not challenged the evaluation of Dr. Chessen, the psychologist. She did not argue that Dr. Chessen was biased against her or evaluated her unfairly. Just before the termination hearing, however, when S.A. submitted her request for a new evaluation, she claimed that Dr. Chessen had a conflict of interest because he had evaluated the children and L.R. as well. She failed to establish such a conflict, however, and in light of the fact that Dr. Chessen evaluated L.R. months after he had submitted his report of S.A.'s evaluation, it is unlikely that she could have done so.

¶30     S.A. likewise failed to challenge the drug analysis results, the technicians or the efficacy of laboratory procedures at the time these results were submitted to the court. Moreover, the court received testimony from a representative of Alternatives, Inc., the facility that performed S.A.'s drug analyses. He explained that when the lab initially detected a "positive" sample from S.A., as was done in October 2001, the lab ran it a second time. This second run confirmed the presence of amphetamines and methamphetamine. The lab then submitted the sample to the State Crime Lab, which confirmed the results as well. Under these circumstances, we conclude that denial by the court of an additional state-paid evaluation and lab analysis was not a deprivation of due process.

¶31 Lastly, S.A. complains that the District Court's denial of her request to allow her counselor to be present during S.A.'s visits with her children and to videotape those visits denied her "due process rights to make a record for appeal." Again, the record indicates that the court did not deny this request. At the time the request was made, S.A. had no visitation rights with her sons. The Department had suspended such rights due to S.A.'s inappropriate actions during multiple visits. The court ruled that upon reinstatement of visitation rights, S.A.'s counselor could be present and videotaping would be allowed if done in a discreet manner and unbeknownst to the children. We conclude, therefore, that the District Court did not violate S.A.'s due process rights by denying these requests.

¶32 Accordingly, we hold that S.A.'s due process rights were not violated by the District Court, the State or the Department.

## CONCLUSION

¶33 For the foregoing reasons, we affirm the District Court.


/S/ PATRICIA O. COTTER


We Concur:

/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE