

DA 13-0051

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 201

IN THE MATTER OF:

J.W.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DN 12-10
Honorable William Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Lucy W. Hansen; Hansen Law Practice; Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General; Kathryn F. Schulz, Assistant
Attorney General; Helena, Montana

        Brett D. Linneweber, Park County Attorney; Kathleen Carrick, Deputy
County Attorney; Livingston, Montana

Submitted on Briefs:   June 12, 2013

Decided:   July 23, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     A.L. appeals from the Order of the Sixth Judicial District Court, Park County, terminating her parental rights to five-year-old J.W.  We affirm, and address the issues:

¶2     *1.  Did the District Court err by failing to conduct a stand-alone hearing on whether the Department should be required to make reasonable efforts to reunify Mother and J.W.?*

¶3     *2.  Did the District Court commit reversible error by failing to conduct a permanency plan hearing?*

¶4     *3.  Did the District Court err by concluding that the circumstances surrounding Mother's prior terminations in Colorado were relevant to her parenting of J.W.?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5     A.L. (Mother) and C.W. (Father) are the biological parents of J.W., a girl.  On December 24, 2012, the District Court terminated Mother's parental rights to J.W. because it determined that Mother's unfit parenting behavior had not changed since a Colorado court had terminated her rights to two other children.  Mother argues that her previously unfit parenting in Colorado should not provide a basis for terminating her parental rights to J.W. because she has changed.

### Termination of Mother's Parental Rights to A.K.M.H. and Q.D.J.W.

¶6     Mother is the biological mother of four children born from 1996 to 2008: Aus. L. (1996), A.K.M.H. (2002), Q.D.J.W. (2005), and J.W. (2008).  In 2005, Mother and Father were living together in Colorado.  Following a domestic violence incident between Mother and Father, the Clear Creek County Department of Human Services (CCDHS) instituted a child-abuse investigation regarding Mother's three children (J.W. was not yet

2

born). The investigation determined that Mother had a history of violence with her domestic partners, used dangerous drugs, and had prior involvement with child protective services in Washington and Idaho. In an attempt to remedy her parenting problems, CCDHS instituted a treatment plan to which Mother agreed. The plan required Mother to, among other things, maintain a clean and sober lifestyle, complete a drug and alcohol evaluation, attend to the medical and mental health needs of her children, stay violence free, and generally be able to parent her children. *People ex rel. A.J.L.*, 243 P.3d 244, 247 (Colo. 2010). Mother failed to comply with the treatment plan: she continued to use drugs and tested positive for methamphetamine several times between October 2006 and March 2007. In May 2007, against the advice of the CCDHS treatment team, Mother moved to Montana, leaving A.K.M.H. and Q.D.J.W. behind. Mother told CCDHS that she was moving "to get away from [Father] and because she did not trust the CCDHS treatment team." *People ex rel. A.J.L.*, 243 P.3d at 247. Truth be told, however, Mother and Father were living together in Livingston, Montana. Mother continued to lie to CCDHS caseworkers about not living with Father because their violent relationship was a primary reason CCDHS was seeking removal of A.K.D.H. and Q.D.J.W.

¶7 In January and February 2009, a Colorado trial court held a three-day trial, which Mother attended, on CCDHS's petition to terminate Mother's parental rights to A.K.M.H. and Q.D.J.W. (Aus. L. was not subject to this proceeding). Based on the testimony, the court terminated Mother's rights because she was "unfit as a parent and unlikely to change within a reasonable period of time":

3

At trial, the People produced substantial evidence and elicited testimony from witnesses supporting its contention that mother continues to deny the severity of abuse she inflicted on [A.K.M.H. and Q.D.J.W.]. They also produced evidence and elicited testimony from witnesses showing that mother's inability or unwillingness to acknowledge the abuse and its impact on her children placed a substantial roadblock between mother and her ability to safely and effectively parent [A.K.M.H. and Q.D.J.W.]. While on the stand, at trial, mother admitted to abusing her oldest son [Aus. L.], but denied that she ever physically abused [A.K.M.H. and Q.D.J.W.] or withheld food from them.

Contrary to mother's testimony, . . . the trial court found that mother left the children without supervision and food; mother and [Father] physically disciplined the children with belts, spoons, and hands; mother confined the children to a dark closet for long periods of time; and the children witnessed domestic violence between mother and [Father].

*People ex rel. A.J.L.*, 243 P.3d at 248-49.

**Termination of Mother's Parental Rights to J.W.**

¶8    Mother gave birth to J.W. in 2008. She continued to be involved in violent domestic relationships. In January 2011, the Department received a report that Mother was intoxicated and fighting with an ex-boyfriend. When Aus. L. tried to stop the fight, the ex-boyfriend began hitting him and the ex-boyfriend's father pulled a gun on Aus. L.

¶9    Mother also continued to abuse drugs and alcohol. On February 9, 2012, the Department received a report that Mother had left Aus. L. and J.W. with another ex-boyfriend and had been missing for three days. When the ex-boyfriend went to Mother's house, she refused to open the door because she "was too drunk." Later that afternoon, Mother came to the ex-boyfriend's house to pick up her children, but told Aus. L. that he had to move out. Aus. L. subsequently moved in with Father.[1]

---

[1]  Father is J.W.'s biological father, not Aus. L.'s.

4

¶10 Over the next few days, Christopher Bly (Bly), a Child Protection Specialist for the Department made unannounced visits to Mother's home but no one answered the door. Bly was subsequently informed by Aus. L.'s juvenile probation officer that Aus. L. was residing in a youth home in Bozeman because Mother had kicked him out of Father's residence. Bly visited Aus. L., who stated that he was sad that his mother had "abandoned him" but was more concerned that there was no one to take care of J.W. in his absence. Aus. L. usually took care of J.W. when Mother was drinking.

¶11 On February 29, 2012, the Department filed a Petition for Emergency Protective Services and Temporary Investigative Authority, seeking leave to investigate J.W.'s well-being and to temporarily place J.W. in a home out of Mother's custody if the circumstances required. The District Court granted the request, and ordered that David Stanley serve as J.W.'s Court Appointed Special Advocate and Guardian Ad Litem (CASA Stanley). The Department and CASA Stanley immediately tried to make contact with Mother to assess J.W.'s well-being. However, Mother did not answer or return their phone calls. On March 2, 2012, Father, with Mother's permission, absconded with J.W. to Washington State, where he left J.W. with her maternal grandmother.

¶12 CASA Stanley visited the grandmother's home in Washington and described the living situation as "wholly inappropriate" for J.W. The grandmother had neither the resources nor the personal strength to care for J.W. She struggled with alcohol abuse and had been the subject of prior child neglect findings in that state. CASA Stanley described Mother's placement of J.W. with the grandmother as "desperate and neglectful." After it

5

was determined the maternal grandmother was not an appropriate placement, J.W. was returned to Montana and placed in a foster home.

¶13 On August 20, 2012, the District Court conducted a hearing on the Department's petition to adjudicate J.W. a youth in need of care. At the conclusion of the testimony, the court ruled that J.W. was a youth in need of care, based on Mother's past history, her action of sending J.W. to Washington, her general instability, and her ongoing drug use.

¶14 Throughout the Montana proceedings, Mother failed to cooperate with the Department. She repeatedly failed to meet with social workers who were trying to assess her parental fitness, and refused to participate in drug testing. Ultimately, the Department was forced to seek a court order to obtain a hair sample, which tested positive for methamphetamine.[2] During the fall, when the Department asked Mother to undergo urinalysis testing, Mother agreed to the testing but then failed to show up.

¶15 On October 11, 2012, the Department filed a petition (1) to forego reasonable efforts to reunify Mother and J.W. and (2) to terminate Mother's parental rights. On December 6, 2012, the District Court held a hearing to address both issues.

**December 6, 2012 Termination Hearing**

¶16 Colorado child-protection worker Sarah Cassano (Cassano) testified that CCDHS first become involved with Mother in 2005, when it received reports that Aus. L. was outside in the cold because his mother would not let him in the home. Cassano said that CCDHS's investigation revealed that Mother had a drug problem and could not

---

[2] Mother also admitted to taking "ecstasy" during the summer of 2012.

adequately parent her children. Cassano also noted that Mother failed to take responsibility for her actions and their impact on her children, and that she had been dishonest throughout the CCDHS's case. Mother's significant problems and her inability to take responsibility led Cassano to believe that Mother would not be able to correct her parenting problems within a reasonable period of time. The District Court found Cassano's testimony "credible" and "consistent with the other witnesses and documents."

¶17 Barbara Maddren-Broughton (Maddren-Broughton), the child protective services supervisor for Park County Child and Family Services, testified that her department first dealt with Mother in 2011, but had received the most recent reports of neglect on February 9, 2012. This was when the Department was notified that Mother was "intoxicated while parenting" and leaving her children with ex-boyfriends for days without returning. Maddren-Broughton also confirmed the details of Father taking J.W. to Washington with Mother's permission. On cross-examination, Maddren-Broughton admitted that the Department had decided to seek termination of Mother's parental rights without a current psychological evaluation or chemical dependency evaluation.

¶18 Prior to the hearing, the Department retained Dr. Michael Butz (Dr. Butz), a clinical psychologist, to perform a "desk review" of various records pertaining to Mother's parenting. Dr. Butz concluded that several factors indicated that Mother would not change her unfit behavior in the foreseeable future. First, Dr. Butz noted that psychological evaluations of Mother from 2007 and 2012 indicated that she "suffers from

7

Personality Disorder and Cyclothymia."[3]  These disorders, Dr. Butz explained, have an "enduring and lasting effect" on Mother's behavior, which explained why her parenting had been "insufficient, neglectful and abusive even without the presence of verifiable substance abuse."  Second, Dr. Butz noted that the documentation indicated that Mother felt that she had done nothing wrong and, thus, had no reason to change her behavior.  Dr. Butz pointed out that according to the prevailing psychology literature Mother's failure to acknowledge her problems indicated she was unlikely to make substantial changes in the "foreseeable future."[4]  Third, Dr. Butz testified that Mother's pattern of abuse and neglect of children, across three states, supported the conclusion that her unfit behavior would not change.  Fourth, Dr. Butz noted that it was significant that Mother had not shown, over all of her years of parenting trouble, a motivation to change her behavior.  Dr. Butz concluded that, without such motivation, all treatments were likely to fail to prompt change in her behavior: "All therapies for the personality disorders, the more recent updates on treating Cyclothymia could be reviewed and the latest on Polysubstance Dependence with regard to methamphetamine could be analyzed but none

---

[3] Dr. Butz explained that "cyclothymia" was an "enduring mood disorder" that was similar to but "lighter" than bipolar disorder.  He testified that Mother's diagnosis of a "personality disorder" generally meant that she had experienced a "developmental rift" when growing up that left her with "histrionic, borderline, and narcissistic traits."

[4] Dr. Butz attributed Mother's lack of motivation to her placement in the "precontemplation stage" in the "Stages of Change" model: "Precontemplation is the stage at which there is no intention to change behavior in the foreseeable future.  Many individuals in this stage are unaware or under aware of their problems."  (Quoting James O. Prochaska & Carlo C. DiClemente, *In Search of How People Change: Applications to Addictive Behaviors*, American Psychologist 1103 (Sept. 1992).)

of this would have any impact so long as [Mother] remains unmotivated for change." The District Court found Dr. Butz's testimony persuasive.

¶19 Mother called Joseph Scalia (Scalia), the therapist who treated Aus. L., to counter Dr. Butz's testimony. Scalia observed Mother with her children "approximately" eight times. Although he had not reviewed any of the Colorado records pertaining to Mother's previous terminations, Scalia concluded the "odds" of Mother psychologically prevailing over her "demons sufficiently to mother a child in the near future" were "substantial." The District Court rejected Scalia's testimony because the court found "no basis for the conclusion that [Mother's] conduct will change in a reasonable amount of time."

¶20 The Livingston Assistant Chief of Police testified as to Mother's contacts with law enforcement between 2009 and 2012. He stated that Mother was involved in several domestic violence situations where the police were called, as well as numerous traffic violations and arrest warrants. The District Court concluded: "While not all of the[se] contacts are serious, they show a general disregard for the law and continuation of the pattern of irresponsibility which carries over to her parenting."

¶21 Donna Delich (Delich), a clinical social worker and licensed addition counselor, testified about Mother's substance-abuse treatment. Delich stated that Mother had only come to see her during two time periods: (1) after Colorado instituted its proceeding to terminate Mother's rights to A.K.M.H. and Q.D.J.W. and (2) after the Department instituted the abuse and neglect proceedings as to J.W. Delich further testified that Mother had recently taken steps to address her drug and alcohol problems; however, it

9

would take two years before Mother was functioning near her normal levels. The District Court found that Delich's testimony exemplified Mother's behavior of only taking corrective action at the 11th hour of termination proceedings: "[Mother's] history with Ms. Delich is typical. [Mother] would seek and attend counseling when something like a hearing was hanging over her head, but otherwise shows little motivation to change."

¶22 Mother also called Annie Fry (Fry), a child mentor who had supervised Mother's thirty-three visits while J.W. was in foster care. Fry stated that she saw "a strong bond between mother and daughter" and only positive interactions during these visits. However, on cross-examination, Fry admitted that a positive interaction during visits was "typical."

¶23 Mother had Linden Kacick (Kacick), a licensed addiction counselor, testify as to Mother's recent participation in a drug and alcohol treatment program. Kacick described Mother's participation in the treatment as "very cooperative," and noted that she was "motivated to make and seek changes in her life." However, Kacick was surprised to learn that Mother had gone through a similar treatment program during the Colorado proceedings that had ultimately been unsuccessful in correcting her parenting problems.

¶24 Post-hearing, the District Court issued its order concluding that the Department need not make reasonable efforts to reunite Mother and J.W., and terminating Mother's parental rights to J.W. The District Court reasoned that reunification efforts were unnecessary because Mother had her parental rights to A.K.M.H. and Q.D.J.W. previously terminated and the circumstances pertaining to those terminations were

"identical" to Mother's unfit parenting of J.W. The court further found that it was in the best interests of J.W. to terminate Mother's parental rights.

## STANDARD OF REVIEW

¶25 "We review for abuse of discretion a district court's termination of parental rights." *In re C.J.*, 2010 MT 179, ¶ 20, 357 Mont. 219, 237 P.3d 1282. This Court reviews a district court's conclusions of law for correctness and its findings of fact to determine if they are clearly erroneous. *In re D.B.J.*, 2012 MT 220, ¶ 23, 366 Mont. 320, 286 P.3d 1021. Whether a district court violated a parent's constitutional right to "fundamentally fair procedures" in termination proceedings, is "a question of constitutional law, for which our review is plenary." *In re T.S.B.*, 2008 MT 23, ¶ 20, 341 Mont. 204, 177 P.3d 429.

## DISCUSSION

¶26 Sections 41-3-601 through 612, MCA provide the "procedures and criteria by which the parent-child legal relationship may be terminated by a court if the relationship is not in the best interest of the child." Section 41-3-602, MCA. These provisions are only operative when "there has been a determination that a child is abused or neglected, as defined in 41-3-102." Section 41-3-602, MCA. "Abused and neglected" is defined as: "(i) actual physical or psychological harm to the child; (ii) substantial risk of physical or psychological harm to a child; or (iii) abandonment." Section 41-3-102(7), MCA. If a child is "abused or neglected," the court is authorized to terminate the parent-child relationship if it finds that any of the criteria enumerated in § 41-3-609(1), MCA, exist.

11

*In re A.H.D.*, 2008 MT 57, ¶ 17, 341 Mont. 494, 178 P.3d 131; *In re K.J.B.*, 2007 MT 216, ¶ 25, 339 Mont. 28, 168 P.3d 629. Section 41-3-609(1)(d), MCA, permits the termination of the parent-child relationship when "the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through 2(e)[.]" Section 41-3-423(2)(e), MCA, in turn permits termination when the parent has "had parental rights to the child's sibling or other child of the parent involuntarily terminated and the circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue."

¶27 In addition to providing grounds for termination, § 41-3-423(2)(e), MCA, relieves the Department of typical requirements under certain circumstances. Typically, before seeking termination of parental rights, the Department must make "reasonable efforts" to remedy the parenting problems that prompted its intervention—by providing, for example, drug treatment programs—so as to preserve and reunify the family. Section 41-3-423(1), MCA ("The department shall make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families."). However, § 41-3-423(2)(e), MCA, exempts the Department from providing these services if a court determines that "preservation and reunification services need not be provided[.]" *See In re A.H.D.*, ¶ 18 ("Section 41-3-423(2)(a)-(e) frees DPHHS from making further efforts to reunify the family once the statutory elements are met."); *In re Custody and Parental Rights of A.P.*, 2007 MT 297, ¶ 17, 340 Mont. 39, 172 P.3d 105.

¶28     *1.  Did the District Court err by failing to conduct a stand-alone hearing on whether the Department should be required to make reasonable efforts to reunify Mother and J.W.?*

¶29     Mother alleges the District Court failed to employ fundamentally fair procedures because it did not hold a separate "pre-hearing" to determine whether reunification of J.W. with Mother was possible.  The Department argues that Mother's claim is without merit because she was given the chance at the December 6, 2012 hearing to "present evidence and cross examine all of the Department's witnesses[.]"  Thus, the Department argues, Mother was provided with fundamentally fair procedures.

¶30     A parent's right to the care and custody of their child is a fundamental liberty interest, which can be terminated only through "fundamentally fair procedures."  *In re A.H.D.*, ¶ 12.  In *In re C.J.*, 2010 MT 179, 357 Mont. 219, 237 P.3d 1282, we analyzed what constitutes "fundamentally fair procedures" when the Department seeks to terminate parental rights based on a prior termination.  There, the Department filed a petition to terminate the parental rights of a mother who had her parental rights to two other children previously terminated.  *In re C.J.*, ¶¶ 9, 13.  The mother had significant mental-health issues, learning disabilities, and abused drugs and alcohol.  *In re C.J.*, ¶ 5.  Because of these problems, the mother was unable to provide a safe and nurturing environment for her first two children.  *In re C.J.*, ¶ 6.  Five years later, the mother gave birth to C.J., and the Department placed C.J. in protective custody because mother had induced her own premature labor, her mental health issues, her lack of stable housing, her criminal propensities, and the involuntary termination of her parental rights to her two other

13

children. *In re C.J.*, ¶ 11. Shortly after, the Department filed a petition requesting the district court to (1) find that reasonable efforts to reunify C.J. and her mother were not required and (2) terminate the mother's parental rights. *In re C.J.*, ¶ 13. The district court held a combined hearing to take evidence relevant to both requests. *In re C.J.*, ¶ 12. On appeal, the mother argued that the district court should have held a separate hearing on the Department's request for an exemption from the "reasonable efforts" requirement. *In re C.J.*, ¶ 25. We held that the combined hearing constituted "fundamentally fair procedures" that adequately protected the mother's rights because she had notice and an opportunity to be heard: she was on notice because the Department stated its intent to forego reasonable efforts in its petition and she was given "ample opportunity" to be heard during the combined hearing through the presentation of evidence and witnesses. *In re C.J.*, ¶¶ 14, 27.

¶31 Likewise, here, Mother was on notice that the Department was seeking to forgo the typical "reasonable efforts" requirement and was given "ample opportunity" to be heard. The Department put Mother on notice that it was seeking exemption from the "reasonable efforts" requirement in its October 11, 2012 petition: "It is . . . requested that the court make a judicial finding that preservation or reunification services are not necessary pursuant to § 41-3-423(2)(e) and (5)." And, Mother had an opportunity to be heard during the December 6, 2012 hearing. At the hearing, Mother had several witnesses testify on her behalf: her chemical dependency counselor, the woman who had supervised Mother's visits while J.W. was in foster care, and Aus. L.'s therapist. She

14

also elicited helpful testimony from the Department's witnesses through cross-examination. By giving notice to Mother and allowing her to be properly heard, the District Court employed "fundamentally fair procedures," and was not required to hold a separate, stand-alone hearing. *In re A.H.D.*, ¶ 12; *In re C.J.*, ¶ 27.

¶32    *2.    Did the District Court commit reversible error by failing to conduct a permanency plan hearing?*

¶33    Mother claims that the District Court's order must be reversed because it failed to conduct the necessary permanency plan hearing. The Department counters that although the court failed to conduct the permanency plan hearing, the purpose of the hearing was fulfilled because the Department was actively working with Father so J.W. could permanently live with him.

¶34    Section 41-3-423(5) provides:

> If the court finds that preservation or reunification services are not necessary pursuant to subsection (2) or (3), *a permanency hearing must be held within 30 days of that determination* and reasonable efforts, including consideration of both in-state and out-of-state permanent placement options for the child, must be made to place the child in a timely manner in accordance with the permanency plan and to complete whatever steps are necessary to finalize the permanent placement of the child.

(Emphasis added.) We have explained that the "purpose of a permanency plan hearing is to assure that children taken into protective custody by the [Department] do not languish in foster care or fall through the proverbial administrative crack." *In re A.R.*, 2004 MT 22, ¶ 21, 319 Mont. 340, 83 P.3d 1287. While we do not condone the failure to hold a permanency plan hearing, we have recognized that such failure is not a *per se* violation of a parent's rights. *See e.g. In re A.R.*, ¶ 21; *In re B.B.*, ¶ 27. So long as the Department's

15

actions are consistent with ensuring the child does not languish in foster-care or administrative limbo, the district court's failure to hold a permanency plan does not violate the terminated parent's right to fundamentally fair procedures. *In re A.R.*, ¶¶ 15, 21-22 (mother's rights not violated by court's failure to conduct hearing within 30 days because DPHHS was working with biological father on treatment plan in hopes to reunify the children with him); *In re B.B.*, ¶ 27 (parents' rights not violated by court's failure to hold hearing because the "Department's repeated efforts to reunite the children with their parents, clearly demonstrate[d] the Department's reunification goal.").

¶35    Here, although the District Court failed to hold a permanency hearing, the Department's actions were consistent with the purposes of such a hearing. During the same time it was seeking a judicial determination that reunification and preservation services were not needed as to Mother, the Department had entered into a treatment plan with J.W.'s father. One of the treatment plan's explicit goals was to assess Father's ability to provide a "safe, appropriate, and stable home environment" for J.W. This plan demonstrated that the purposes of a permanency hearing—to ensure that the Department is moving forward with a permanent placement for the child—was being fulfilled. The District Court's failure to hold a permanency plan hearing did not violate Mother's right to fundamentally fair procedures. *In re A.R.*, ¶ 21; *In re B.B.*, ¶ 27.

¶36    *3. Did the District Court err by concluding that the circumstances surrounding Mother's prior terminations in Colorado were relevant to her parenting of J.W.?*

¶37    Mother argues that the problems giving rise to the Colorado termination of her parental rights—she had moved to Montana, was involved in violent domestic

16

relationships, and her unwillingness to acknowledge harm caused to her children—were not present in her parenting of J.W., and, therefore the Colorado terminations are not relevant to this proceeding. The State counters that the Colorado proceedings are relevant because the circumstances that led to the prior terminations have remained unchanged: Mother continues to use dangerous drugs, is resistant to treatment, and continues to be involved in relationships with domestic violence. These issues, the State argues, have created a dangerous environment for J.W. just as it did for Mother's previous children.

¶38 At "any time during an abuse and neglect proceeding," the Department may seek a judicial determination that "preservation or reunification services need not be provided." Section 41-3-423(2), MCA. The court has the authority to make such a determination, if the parent: "had parental rights to the child's sibling or other child of the parent involuntarily terminated and the circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue." Section 41-3-423(2)(e), MCA. The court's finding that (1) the parent's parental rights have previously been terminated and (2) that the circumstances surrounding the prior termination are "relevant" to the current termination proceeding "must be supported by clear and convincing evidence." Section 41-3-423(4), MCA; *In re A.P.*, ¶ 23 (the Department must show by clear and convincing evidence these two statutory requirements have been met). Because it is undisputed that Mother has been subject to previous involuntary terminations, we need only determine whether the District Court

17

correctly concluded that the circumstances surrounding those terminations are "relevant" to the current termination proceeding.

¶39　Circumstances surrounding previous involuntary terminations remain "relevant," "unless the circumstances have changed." *In re A.P.*, ¶ 30; *In re K.J.B.*, ¶ 36. This construction of "relevant" recognizes that a parent is not to be afforded multiple chances to remedy the same problems at the expense of an abused or neglected child's welfare: "A prior termination, followed by a parent's demonstration of continuing unfitness, indicates that decisive termination of parental rights is the best way to protect a child's welfare." Kathleen Haggard, *Treating Prior Terminations of Parental Rights as Grounds for Present Terminations*, 73 Wash. L. Rev. 1051, 1053 (1998).

¶40　*In re K.J.B.*, ¶¶ 3, 7, 9-10, dealt with termination of the parental rights of a mother and father who had had their rights to four previous children terminated for being "unable or unwilling to provide the child[ren] with the special care" they needed. The previous children were all born with a "chromosomal abnormality" that left them needing specialized care. *In re K.J.B.*, ¶¶ 4, 9-10. The parents repeatedly failed to actively participate with their treatment plans designed to teach them how to provide that care and their parental rights were terminated. *In re K.J.B.*, ¶¶ 5, 7. Later, K.J.B. was born with the same chromosomal abnormality. *In re K.J.B.*, ¶ 11. The Department petitioned to terminate the parents' rights and asked the court to find that reasonable efforts to reunify the parents with K.J.B. were not required because of the previous terminations. *In re K.J.B.*, ¶ 13. The District Court heard the testimony of several witnesses before

18

concluding that reasonable efforts were not necessary because the circumstances present in four previous terminations were relevant to their parenting of K.J.B. *In re K.J.B.*, ¶ 21. The parents appealed and we affirmed, reasoning the circumstances (the parents' unfit behavior) remained unchanged since the prior terminations:

> Our review of the record convinces us that DPHHS met its burden of establishing that [the parents] remain unable to safely and adequately address K.J.B.'s special needs and provide for her necessary care . . . . In this respect, their circumstances are unchanged from the circumstances surrounding and underlying their previous parental terminations. The District Court heard extensive testimony from numerous professionals who have worked with, observed or evaluated the parents . . . . Under these circumstances, it is apparent that the two critical circumstances—the parents' limitations and the special needs of the child—that were relevant to the parents' inability to care for their previous children had not changed.

*In re K.J.B.*, ¶ 36; *accord In re A.P.*, ¶¶ 29-30 (circumstances of prior termination relevant because mother continued to make decisions detrimental to A.P.'s well-being).

¶41 Here, substantial evidence supported the District Court's determination that Mother's unfit behavior remained unchanged since Colorado terminated her rights to A.K.M.H. and Q.D.J.W. The testimony established that Mother continued to suffer from the same mental health problems she did during the Colorado proceedings. Dr. Butz reviewed psychological examinations of Mother from 2007 and 2012; both concluded that Mother suffered from a personality disorder and "cyclothymia." Testimony also established that Mother continued to use dangerous drugs and abuse alcohol during her parenting of J.W. A hair sample obtained from Mother by court order tested positive for methamphetamine. The Department first began investigating Mother when it received reports that she had left J.W. at an ex-boyfriend's house and would not take her back

19

because she "was too drunk." Finally, the testimony established that Mother continues to be involved in violent relationships that put her children in danger. On December 7, 2011, the Department received a report that Mother was intoxicated and fighting with an ex-boyfriend. When Aus. L. stepped in to help, the ex-boyfriend's father pointed a gun at him. In addition, law enforcement testimony established that Mother had been involved in several domestic violence situations.

¶42 These conditions once again contributed to Mother's unacceptable parenting. Just as she left A.K.M.H and Q.D.J.W. behind in Colorado when she moved to Montana, Mother left J.W. with an ex-boyfriend for three days while she drank alcohol.[5] Further, she approved of Father's absconding of J.W. to Washington, where the environment was "wholly inappropriate" for a child; the grandmother was intoxicated while taking care of J.W. and there was little food in the residence. The competent testimony further established that Mother is unlikely to change her unfit behavior in the "foreseeable future." Dr. Butz testified that Mother's psychological state and her track record demonstrate that Mother did not have the necessary motivation to make the substantial changes needed. To be sure, Mother did make what appear to be small steps in the right direction just prior to the termination hearing—for example, she sought out

---

[5] Mother argues that her move to Montana was a primary reason that Colorado terminated her parental rights, and that this reason is not relevant here because she has not moved anywhere. However, Mother's argument misses the point. Colorado terminated her parental rights, not merely because she had moved, but because the move was evidence that she would abandon her children. In this case, Mother likewise demonstrated her willingness to abandon J.W. when she left her with an ex-boyfriend for three days while she was drinking.

substance-abuse treatment. However, Mother's past demonstrates that she only participates in treatment programs when a termination proceeding is pending.

¶43 The evidence that the circumstances surrounding Mother's termination in Colorado remained relevant to her parenting of J.W. was "definite, clear, and convincing[.]" *In re J.L.*, 277 Mont. at 289, 922 P.2d at 462. The District Court did not abuse its discretion.

¶44 Affirmed.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ PATRICIA COTTER

21