
DA 10-0117

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 179

IN THE MATTER OF:

C.J.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN 09-38
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Joslyn Hunt, Chief Appellate Defender, Helena, Montana

        Elizabeth Thomas, Office of Appellate Defender, Missoula, Montana

    For Appellee:

        Steve Bullock, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

        Fred Van Valkenburg, Missoula County Attorney, Missoula, Montana

        Kimberly Dudik, Assistant Attorney General, Missoula, Montana

Submitted on Briefs:  July 21, 2010

Decided:  August 17, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 C.J. is the third child of L.S. (Mother). Mother's parental rights to her first two children were terminated several years before C.J. was born. The Department of Health and Human Services (DPHHS or Department) took custody of C.J. shortly after her birth. DPHHS moved the Fourth Judicial District Court for an order holding that reasonable efforts toward reunification were not required in this case based on the previous terminations of Mother's parental rights and other pertinent circumstances. After numerous hearings, the District Court terminated Mother's rights to C.J.

¶2 Mother appeals arguing that the District Court abused its discretion by failing to hold a *timely* hearing on DPHHS's "reasonable efforts" request. She claims the unreasonable delay in conducting the hearing violated her right to a fundamentally fair proceeding. She also claims that the court's ruling that the Department could forego reasonable efforts, and the court's termination of her parental rights constituted an abuse of discretion. We affirm.

## ISSUE

¶3 A restatement of the dispositive issue on appeal is:

¶4 Did the District Court abuse its discretion when it terminated Mother's parental rights?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Mother has been diagnosed with somatization disorder, mild mental retardation, and borderline personality disorder with the possibility of Munchhausen's Syndrome. Psychological testing revealed severe cognitive impairment, developmental delays, and

2

difficulty learning new tasks and reading social cues. She further has a history of drug and alcohol abuse but reportedly had stopped using these substances at the time this case was pending.

¶6 Mother's earlier children were born in May 2003 and April 2004. The biological father of these children is Mother's former partner, T.F. The first child was born three weeks prematurely and the second child was eight weeks early. At the time the first child was born, hospital staff observed Mother's and T.F.'s interaction with the child and became concerned that the parents would not be able to provide a safe and nurturing environment for the child. As a result, the Department was notified and was awarded Temporary Investigative Authority over the infant and the child was placed in foster care. The Department worked closely with the parents in an effort to teach them necessary parenting skills. The Department made two attempts to reunite this child with the parents but both attempts failed.

¶7 In April 2004, a second child was born. In view of the parents' inability to provide adequate care for their first child, the Department placed a protective hold on this second child. In a continued effort to unite the family, the Department approved a living arrangement in which T.F., Mother and both children would live with T.F.'s aunt and uncle. This arrangement lasted about six weeks at which time the children were removed from the home and placed in foster care.

¶8 By June 2004, both children were adjudicated youths in need of care and treatment plans were developed for the parents. During this time, the Department took numerous steps to evaluate the parents' abilities and to teach them necessary parenting skills.

3

Despite the Department's close oversight and the abundance of services and resources made available to the parents, their mental health problems, learning disabilities and persistent resistance to assistance, as well as the children's diagnosed special needs, rendered Mother and T.F. unable to progress under the treatment plans.

¶9 The Department ultimately moved to terminate Mother's and T.F.'s parental interests in the children and to place them for adoption. In March 2006, after concluding that the statutory requirements for termination were satisfied, the district court granted the Department's motion and terminated the parents' rights. Both children were subsequently adopted by a Bozeman couple. In 2007, the adoptive parents reported that Mother and T.F. had been "stalking" them at their home despite an order preventing any contact with the children.

¶10 At some time in 2008, Mother and T.F. ended their relationship and Mother embarked upon a new one. However, Mother and her new partner continued living with T.F. In October 2008, Mother and her new partner began stalking Mother's children and their adoptive family.

¶11 On May 25, 2009, Mother, approximately five months pregnant, was hospitalized with placental abruption. On June 14, 2009, Mother reported to the nurses she was bleeding. On June 30, the hospital performed an emergency Caesarean section. The child, C.J., was delivered eleven weeks early and weighed three pounds. Hospital staff suspected, and noted in its records, that Mother attempted to induce early labor by introducing a foreign object into the vaginal canal. The hospital noted that such behavior is not uncommon for a woman with Mother's psychological diagnoses.

4

¶12 Mother reported that her new partner was the child's father (Father). By the time C.J. was born, the parents were no longer living with T.F. and were homeless. The child was placed in protective custody shortly after birth. DPHHS cited the following reasons for protective custody: Mother's intentional induction of premature labor, her mental health and cognitive issues, her lack of stable housing, her past and then-current charges of criminal activities, and the involuntary termination of her parental rights to her two other children.

¶13 C.J. required hospitalization for fifty-seven days. During this time, nurses at the hospital tried to teach both Mother and Father how to care for their newborn child, especially in light of the child's special needs brought on by her premature birth. Mother was unable to perform even the most basic activities for C.J.'s care. On July 22, 2009, before C.J. was discharged from the hospital, the Department filed a Petition for Emergency Services, Adjudication as a Youth in Need of Care, Finding that Reasonable Efforts Are Not Required, and Termination of Mother's Parental Rights to Youth as a Consequence of Mother's Conduct. The Department took custody of C.J. upon her hospital discharge in August 2009. The Department argued that reasonable efforts to reunify C.J. with her parents were unnecessary under the circumstances of this case.

¶14 On August 20, 2009, counsel for Mother objected to the removal of C.J. and moved the court for a hearing on the Department's assertion that reasonable efforts were not necessary. On August 25, the District Court held a show cause hearing and set a hearing on the State's petition for September 3, 2009. At the September 3 hearing, the District Court heard various witnesses testify on behalf of Mother. It ordered that

5

DPHHS would retain custody of the child but ordered the Department to accommodate additional visitation for the parents. The court further explained to the parents that reunification may not occur any time soon because of the risk to C.J. Also, in response to the State request that a guardian ad litem be appointed for Mother, the court so ordered. The District Court also addressed Father's willingness to parent C.J. on his own if Mother could not. The court suggested neuropsychological evaluation for Father. The State advised that a disposition hearing was not necessary as it was seeking to terminate Mother's parental rights and was preparing a treatment plan for Father only. The court, nonetheless, set a disposition hearing as to both parents on September 25.

¶15 On September 21, the court issued an order in which it found C.J. to be a youth in need of care. On September 24, the court appointed special advocate (CASA) issued a periodic report to the court indicating that C.J. was progressing well in the foster home and was in a "safe and nurturing environment." The CASA expressed continued concern over Mother's ability to parent noting that Mother, after three children, remained challenged by diapering, holding the child in a manner providing head and neck support, dressing C.J. and using an infant car seat.

¶16 At the September 25 disposition hearing, the court ordered a neuropsychological evaluation for Father. It also heard testimony that Father may not actually be the father of the child, and that two other men could possibly be C.J.'s father. The State requested paternity testing of Father, which he opposed. The court determined that Mother and Father were married by common law, and therefore Father would be deemed the parent.

6

¶17 A status conference was held on October 27. The State told the court that Father's treatment plan was not yet approved. Father reported that the proposed treatment plan anticipated him parenting without participation by Mother—in other words, ending his relationship with Mother—and he did not intend to do that. The court disagreed that this was required by the treatment plan and approved the plan. Father objected to the psychologist chosen to administer testing and requested that testing be conducted by another doctor. The Department expressed its concerns about the suggested physician. After extensive discussion, the court instructed Father to use the original psychologist and to seek approval for payment of his chosen doctor to provide a second opinion. Mother's Guardian Ad Litem complained that the hearing on "reasonable efforts" was too distant and requested that the court find that reasonable efforts were necessary as to Mother. The District Court denied the request but granted all parties the right to file a response to the Department's submitted point brief on the appropriateness of foregoing reasonable efforts. It set a December 11 hearing for both Mother's termination and to address DPHHS's request that reasonable efforts and reunification services need not be provided to Mother.

¶18 At the December hearing, the court heard extensive testimony and then took the matter under advisement. It set a status conference for December 15. At the status conference, the court reported that after reviewing and considering the testimony presented during all the hearings in the matter as well as court records from Mother's earlier terminations, it concluded that DPHHS had made reasonable efforts toward reunification with Mother in the past and during this case, and that Mother was not

7

capable of caring for the minor child. The court granted the Department's petition for termination. The District Court set a hearing for Father for January 2010, and discharged the services of Mother's guardian ad litem.

¶19 The District Court issued its Findings of Fact, Conclusions of Law, and Order Terminating the Mother's Parental Rights on January 22, 2010. It is this Order that Mother appeals. At the time of this appeal, Father was not progressing well with his treatment plan; therefore, the court extended temporary legal custody to the Department.

## STANDARD OF REVIEW

¶20 We review for abuse of discretion a district court's termination of parental rights. We determine whether the district court's findings of fact are clearly erroneous and whether the conclusions of law are correct. *In re B.M.*, 2010 MT 114, ¶ 14, 356 Mont. 327, 233 P.3d 338 (citations omitted).

## DISCUSSION

¶21 *Did the District Court abuse its discretion when it terminated Mother's parental rights?*

¶22 Mother does not challenge the District Court's factual findings, but challenges the court's failure to conduct an earlier "reasonable efforts" hearing and its legal conclusion to terminate Mother's parental rights. Mother states that she is also challenging the District Court's conclusion that "reasonable efforts" by DPHHS were not required in this case. However, both the transcript of the hearing and the court's January 22, 2010 order reflect that the court did not conclude that "reasonable efforts" were not required; rather, it concluded that the Department had made "reasonable efforts" in this case. Therefore,

8

we look only at whether the hearing on this issue was held in an untimely manner and whether the District Court abused its discretion in terminating Mother's rights.

¶23    It is the policy in Montana to protect children whose health and welfare may be threatened by those persons responsible for their care, but this protection must be provided in a manner that preserves the family environment, if possible. Section 41-3-101(1)(a) and (b), MCA. In its mission to protect children, DPHHS must make "reasonable efforts" to avoid removing a child from its family, or if removal is necessary, make "reasonable efforts" to reunify the family. Such efforts include, but are not limited to, entering into voluntary protective service agreements, developing individual written case plans, and providing services pursuant to such a plan. Section 41-3-423(1), MCA. In making decisions about preserving or reunifying families, DPHHS must always consider the health and safety of the child. Section 41-3-423(1), MCA.

¶24    There are circumstances, however, under which the Department need not make such "reasonable efforts." Rather, upon removal, DPHHS may request a court ruling that "reasonable efforts" are not necessary and then proceed toward terminating parental rights instead of toward reunification. Section 41-3-423(2), MCA. One such circumstance is when a parent has had parental rights to a child's siblings involuntarily terminated and the circumstances related to the earlier terminations are relevant to the parent's ability to adequately care for the current child at risk. Section 41-3-423(2)(e), MCA. It is under this provision that DPHHS sought the District Court's permission to proceed to termination of Mother's rights without pursuing further actions toward reunification. The Department argued that Mother had had her parental rights

9

involuntarily terminated to C.J.'s older siblings and the same circumstances that resulted in those terminations continued to exist and prevent Mother from safely caring for C.J.

¶25 While the statute addresses circumstances under which the Department may request an exemption from "reasonable efforts," it does not provide a timeline for a hearing on a "reasonable efforts" motion or a decision by the court. Mother argues that four and one-half months passed from the time the Department requested exemption from "reasonable efforts" until the District Court held a hearing on the motion. She argues that this delay prejudiced her, violated her right to a fundamentally fair proceeding, and that during this time the Department did not provide her with helpful services.

¶26 It is well established that a "natural parent's right to care and custody of a child is a fundamental liberty interest which courts must protect with fundamentally fair procedures at all stages of the proceedings for the termination of parental rights." *In re B.N.Y.*, 2003 MT 241, ¶ 21, 317 Mont. 291, 77 P.3d 189, *citing In re T.C. and W.C.*, 2001 MT 264, ¶ 22, 307 Mont. 244, 37 P.3d 70; *In re A.F.-C.*, 2001 MT 283, ¶ 31, 307 Mont. 358, 37 P.3d 724. As such, termination procedures must satisfy the Due Process Clause of the Fourteenth Amendment. *B.N.Y.*, ¶ 21. A parent may not be placed at an unfair disadvantage during the termination proceedings. *In re T.C.*, 2008 MT 335, ¶ 16, 346 Mont. 200, 194 P.3d 653.

¶27 Key components of a fair proceeding are notice and an opportunity to be heard. *In re T.C. and W.C.*, ¶ 22. Notice is not at issue in this case as no one disputes that Mother had notice of the Department's intent to forego reasonable efforts. Furthermore, the record reveals that Mother was given ample opportunity to be heard. This case was

10

extensively litigated, and the court conducted multiple hearings that—while not designated as hearings on "reasonable efforts"— were conducted in a manner in which Mother was allowed to present her claims. At the actual "reasonable efforts" hearing in December 2009, the court heard lengthy testimony and learned that a public health nurse was assigned to help Mother and Father learn to properly change a diaper and hold C.J. in a supportive safe manner, a certified lactation consultant assisted Mother in breast feeding technique and provided breast pumps, and supervised visitation was regularly scheduled. Lastly, the Department arranged for another neuropsychological evaluation to establish whether Mother's previously-diagnosed impairments had improved. We note as well that witnesses testifying on Mother's behalf failed to identify any additional services that could have been provided to Mother for help with C.J. that may have prevented removal or encouraged reunification.

¶28 Based upon our review of the record, we are not persuaded that Mother was denied a meaningful opportunity to establish that the Department could, and should, have provided her with additional services or that she was the victim of a fundamentally unfair procedure. Moreover, as noted above, while the Department requested an exemption from the requirement to make reasonable efforts at reunification, the court did find as a matter of fact that reasonable efforts to reunify had been made.

¶29 We turn now to whether the District Court abused its discretion in terminating Mother's parental rights. Section 41-3-609, MCA, sets forth the criteria for terminating a parent's right to a child. The relevant provisions are:

11

(1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:

.   .   .

(d) the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through (2)(e); [or]

.   .   .

(f) the child is an adjudicated youth in need of care and both of the following exist:
(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

.   .   .

(4) A treatment plan is not required under this part upon a finding by the court following hearing if:
(a) the parent meets the criteria of subsections (1)(a) through (1)(e).

Section 41-3-609(1)(d) and (f)(i), (ii) and (4)(a), MCA.

¶30 In this case, Mother was not given a treatment plan because she met the criteria of § 41-3-609(1)(d), MCA. This provision refers back to § 41-3-423(2)(e), MCA, which is the statute that allows a court to exempt the Department from making reasonable efforts to reunify a family if a parent has had his or her parental rights to a child's siblings involuntarily terminated.

¶31 Therefore, in this case, the District Court:

1)   adjudicated C.J. a youth in need of care (§ 41-3-102, MCA);

2)   expressly noted that Mother's rights to C.J.'s older siblings had been involuntarily terminated (§ 41-3-609(1)(d) and (4)(a), MCA);

12

3) heard conflicting testimony over whether the condition that rendered Mother unfit to parent her first two children had improved or was likely to improve in a reasonable amount of time;

4) weighed the credibility of the witnesses (*Kulstad v. Maniaci*, 2009 MT 326, ¶ 90, 352 Mont. 513, 220 P.3d 595) and concluded that Mother's condition had not improved and was unlikely to improve in a reasonable period of time (§§ 41-3-423(2)(e) and 41-3-609(1)(d), (4)(a), MCA);

5) concluded that sufficient reasonable efforts had been made to reunify the family (§ 41-3-423, MCA);

6) gave primary consideration to the physical, mental, and emotional needs of C.J. (§ 41-3-609(3), MCA); and

7) concluded that it was in C.J.'s best interest to terminate Mother's parental rights.

¶32 The court's unchallenged findings were sufficiently specific and supported by the record and its legal conclusions were correct. The clear and convincing evidence in this case supports the District Court's ruling to terminate Mother's parental rights. The court did not abuse its discretion in so ruling.

## CONCLUSION

¶33 For the foregoing reasons, we affirm the judgment of the District Court.


/S/ PATRICIA COTTER


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

13