For Appellant: Julie Brown, Montana Legal Justice, PLLC, Missoula, Montana.
For Appellee: Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana Kirsten Pabst, Missoula County Attorney, Jessica Finley, Deputy County Attorney, Missoula, Montana.
Chief Justice Mike McGrath delivered the Opinion of the Court.
**265 ¶1 R.K. ("Father") appeals a January 23, 2018 Fourth Judicial District Court order terminating his parental rights to I.K. We affirm.
¶2 We restate the issue on appeal as follows:
Did the District Court abuse its discretion when it determined that termination was in I.K.'s best interests?
*87 FACTUAL AND PROCEDURAL BACKGROUND
¶3 Father is the biological parent of eleven-year-old I.K. In 2016, I.K. lived with Mother and two of I.K.'s half-siblings, ages ten and four. The Department of Public Health and Human Services ("the Department") initiated its present involvement with Mother on May 5, 2016, when nobody arrived to pick I.K. and her sibling up from school and Mother **266 failed to respond to the school's phone calls. The children reported Mother was not feeling well, mumbling, and kept passing out in the car and on the couch. Alysen Henderson, a child protection specialist ("CPS"), picked the children up and took them home. When they arrived at the home, Mother was glossy-eyed, unable to communicate, and in possession of drug paraphernalia.
¶4 At the time, I.K. was living with Mother but her paternal grandfather was her legal guardian ("Guardian").[1] Mother agreed to work with the Department voluntarily for thirty days, during which the children would be placed with their maternal grandmother. Mother was unable to complete the prescribed tasks during the thirty days and the Department filed a Petition for Emergency Protective Services, Adjudication as a Youth in Need of Care, and Temporary Legal Custody ("TLC"). Father was incarcerated at Montana State Prison ("MSP") during this time.
¶5 At a July 7, 2016 hearing, Father appeared telephonically and was represented by counsel. Father stipulated to the adjudication of I.K. as a youth in need of care. At an August 30, 2016 hearing, Father's counsel informed the District Court that Father would like a court-ordered treatment plan, but requested that the plan be compatible with his current incarceration and take into consideration Father's upcoming parole hearing, which could influence where Father would serve the remainder of his sentence. The District Court ordered Father to complete a parenting class while in prison, create a relapse plan, and engage in medically assisted treatment.
¶6 On January 6, 2017, the Department sought an extension of TLC because Mother and Guardian were not progressing on their treatment plans. Father did not object and the District Court issued an extension of TLC until July 7, 2017. Father transferred to a prerelease program and on January 23, 2017, the District Court approved Father's treatment plan.
¶7 On March 16, 2017, the court-appointed special advocate ("CASA") notified the District Court that Father's prerelease placement had been revoked and he was incarcerated again. The CASA noted that Father "has not been in [I.K.'s] life for any consistent amount of time." On June 1, 2017, a permanency plan hearing was held with the objective of reunifying I.K. with Mother, Father, or Guardian. At the time, Father remained incarcerated at MSP.
**267 ¶8 On October 5, 2017, the Department filed a petition seeking to terminate Father's and Mother's parental rights to I.K. As the basis for termination, the Department's petition asserted that Father had been incarcerated for more than one year and, in the alternative, that Father had failed to successfully complete a treatment plan. Section 41-3-609(4)(c), (1)(f), MCA, respectively.
¶9 The hearing was held on December 7 and 8, 2017, shortly after Father was released from prison. The District Court found that, based on Father's "extensive criminal history, extensive history of incarceration, [and] extensive and chronic history of substance use and chemical dependency," Father was unfit, unable, or unwilling to provide adequate parental care to I.K. On January 23, 2018, the District Court terminated Father's parental rights to I.K. for failure to comply with an appropriate court-approved treatment plan, and because Father had been incarcerated for more than one year.[2]
*88 STANDARD OF REVIEW
¶10 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. In re T.S. , 2013 MT 274, ¶ 21, 372 Mont. 79, 310 P.3d 538. A district court abuses its discretion only if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. In re Declaring A.N.W. , 2006 MT 42, ¶ 29, 331 Mont. 208, 130 P.3d 619. We review a district court's findings of fact to determine whether they are clearly erroneous and its conclusions of law to determine whether they are correct. In re T.S. , ¶ 21.
DISCUSSION
¶11 Did the District Court abuse its discretion when it determined that termination was in I.K.'s best interests?
¶12 The district court may order a termination of the parent-child legal relationship upon a finding, established by clear and convincing evidence, that the statutory criteria have been met. Section 41-3-609(1), MCA. In Montana, the Department must make reasonable efforts to prevent removal of a child and reunite a family. Section 41-3-423(1), MCA. The removal and protection of a child must be provided in a manner that preserves family unity, if possible. Section 41-3-101(1)(a), (b), MCA ; In re C.J. , 2010 MT 179, ¶ 23, 357 Mont. 219, 237 P.3d 1282. When terminating parental rights, the district court's **268 chief concern is the best interests of the child. In re T.S., ¶ 30 (citing In re Custody and Parental Rights of D.A ., 2008 MT 247, ¶ 21, 344 Mont. 513, 189 P.3d 631 (quoting In re E.K ., 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690 ) ). "Children need not be left to twist in the wind when their parents fail to give priority to their stability and permanency." In re T.S., ¶ 30.
¶13 Father asserts that the District Court abused its discretion when it terminated his parental rights pursuant to § 41-3-609(4)(c), MCA, because the Department failed to demonstrate reunification was not in I.K.'s best interests.
¶14 Termination may be ordered without a treatment plan pursuant to § 41-3-609(4)(c), MCA, if "the parent is or will be incarcerated for more than 1 year and reunification of the child with the parent is not in the best interests of the child because of the child's circumstances, including placement options, age, and developmental, cognitive, and psychological needs."
¶15 Evidence presented at the termination hearing demonstrated that Father had been incarcerated for approximately seventeen of the nineteen months since I.K. was removed from Mother's care. Father was in prerelease for the other two months.
¶16 Throughout these proceedings, I.K. has transitioned between at least five separate placements in a twenty-month period. Father has been incarcerated for the majority of I.K.'s life, primarily as a result of his drug dependency. Since 2013, with the exception of a few unsuccessful prerelease placements and probationary periods, Father has been incarcerated. In 2017, Father's prerelease placement was revoked when, less than two months into his release, Father used opiates and methamphetamine.
¶17 Father concedes that he was incarcerated for more than one year, but contends the Department failed to establish that termination was in I.K.'s best interests considering no other placement options had been identified for I.K. The record reflects that I.K.'s Guardian was having difficulties parenting I.K. because of her challenging behavioral needs and that Mother failed to comply with her treatment plan.
¶18 CPS testimony and reports conclude that continued reunification efforts with Father would cause further disruption and instability for I.K. According to one report, I.K. exhibited symptoms of Reactive Attachment Disorder and high levels of anxiety associated with the continuous placement disruptions. Because of I.K.'s transient placements, I.K. has developed "extremely significant high needs and behavioral concerns" manifested in difficulties in school, mood dysregulation, and destructive and sexualized behaviors. CPS
**269 Henderson testified that giving Father more time to work on his treatment plan would be harmful to I.K.'s development because "I.K. needs to be able to *89 move forward and have closure, and having her parents in her life when they feel necessary is just detrimental to her." Henderson further testified that I.K. needed to have permanency and stability, and recommended I.K.'s placement in a therapeutic foster home or group home. The Department urges that it would be able to pursue I.K.'s needs if Father's parental rights were terminated. Moreover, I.K. herself has expressed the desire not to live with Father because of her fear that he would leave again.
¶19 Father argues that the Department failed to act in good faith when it presented him with the opportunity to complete the court-approved treatment plan but then pursued termination before he was released from prison and before he could have reasonably completed any of the treatment plan tasks. Father's argument fails to acknowledge the revocation of his prerelease placement. His treatment plan was approved on January 23, 2017. However, the Department was notified on March 1, 2017, that Father was incarcerated again for using opiates and methamphetamine. Father's long history of incarceration and chemical dependency, combined with his contemporaneous drug use, gave the Department reason to believe that Father would not adequately care for I.K. The Department's pursuit of termination was justified.
¶20 The record reflects that Father has not prioritized his relationship with I.K. Significantly, Father voluntarily discharged to Sidney, Montana, knowing that I.K.'s placement was in Belgrade. This distance prevented visitation with I.K. that the Department attempted to arrange.
¶21 Father has demonstrated his willingness to parent I.K. through completing a parenting class, obtaining a job, a home, and having frequent phone contact with I.K. However, these efforts are outweighed by I.K.'s best interests.
¶22 The District Court's finding that termination was in I.K.'s best interests was supported by clear and convincing evidence. Furthermore, the best interests of a child are statutorily presumed to be best served by termination when the child has been in foster care for fifteen months of the most recent twenty-two months. Section 41-3-604(1), MCA. I.K. was in foster care under the physical custody of the State for nineteen months leading up to the termination hearing.
¶23 It is not necessary to reach Father's argument that the District Court erred when it terminated Father's parental rights for failure to comply with his treatment plan. Although failure to comply with a **270 treatment plan may lead to the termination of parental rights, Father's incarceration for more than one year is an independent basis for termination. Section 41-3-609(4)(c), MCA.
CONCLUSION
¶24 The District Court did not abuse its discretion when it found that termination of Father's parental rights was in I.K.'s best interests.
¶25 Affirmed.
We Concur:
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.
BETH BAKER, J.
¶26 I dissent from the majority's conclusion upholding termination of Father's parental rights pursuant to § 41-3-609(4)(c), MCA.
¶27 Father was incarcerated at the time I.K. was removed from Mother's care. At the time of removal, Father had been incarcerated most of I.K.'s life and had an extensive and chronic history of substance use and chemical dependency. At the time of removal, the Department could have asserted that pursuant to § 41-3-609(4)(c), MCA, it was not required to offer Father a treatment plan and that reunification was not in the best interests of I.K. It did not. Instead, the Department entered into a treatment plan with Father. The treatment plan required Father to complete some tasks while incarcerated and then complete a variety of other tasks upon release. Father thereafter completed the tasks of the plan which he could complete while incarcerated. Shortly before Father's release, the Department filed its *90 petition seeking to terminate Father's parental rights. The Department asserted it was in I.K.'s best interests to terminate Father's parental rights as she needed permanency and stability.
¶28 The Department "has a duty to act in good faith in developing and executing a treatment plan to preserve the parent-child relationship and the family unit." In re D.B. , 2007 MT 246, ¶ 33, 339 Mont. 240, 168 P.3d 691. Once the Department entered into the treatment plan with Father, it had a good-faith obligation to provide him a reasonable period in which to complete the treatment plan tasks. The Department failed to meet its obligation to act in good faith by entering into a treatment plan which by its nature could not be completed until Father was released from incarceration and then filing a petition to terminate Father's parental rights prior to his release from incarceration.
¶29 Although Father was not released from incarceration as early as the Department desired, his release only delayed his ability to work on post-incarceration treatment plan tasks for one or two months more **271 than if he had maintained his earliest release.[1]
¶30 Furthermore, at the time of the termination hearing, the Department admitted it had no permanent or long-term placement available for I.K. and did not expect to find one for quite some time. Thus, the Department had no means of providing I.K. with stability and permanence in the foreseeable future, negating the very reasons for which the Department asserted it was in I.K.'s best interests to terminate Father's parental rights.
¶31 I would conclude the Department failed to meet its obligation to act in good faith in executing the treatment plan to preserve the parent-child relationship and the family unit and remand to require the Department to provide Father a reasonable period to complete his treatment plan.

I.K. was removed from her Mother's care in 2011 due, in part, to Mother's drug and alcohol abuse.

Mother's parental rights to I.K. were also terminated.

Father initially hoped to be released to attend Connections Corrections treatment program to be followed by Pre-Release. He was denied this release and ultimately was released briefly to a Pre-Release program. This release was revoked for violations of the Pre-Release program. However, had Father been initially accepted to Connections Corrections followed by Pre-Release, he would have been able to engage in parenting treatment plan tasks at about the same time as he was when he was finally released. Further, had he successfully completed the Pre-Release program he was released to, he would have only been able to begin completion of post-release treatment plan tasks one to two months earlier than he was.