FILED

03/04/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0410

DA 24-0410

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 44N

IN THE MATTER OF:

L.S.A.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADN-22-168
Honorable David J. Grubich, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Shannon Hathaway, Hathaway Law Group, Missoula, Montana

    For Appellee:

    Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

    Joshua A. Racki, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  February 5, 2025

Decided:  March 4, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     K.V. (Father) appeals an order of the Eighth Judicial District Court, Cascade County, terminating his parental rights to L.S.A. and granting permanent legal custody to the Montana Department of Public Health and Human Services, Child and Family Services Division (the Department). We affirm.

¶3     L.S.A. was born in late November 2022 and placed in protective custody immediately based on M.A. (Mother)'s erratic behavior, lack of secure housing, and history with the Department. Mother initially refused to name L.S.A.'s father, but Father later arrived at the hospital and identified himself to the child protection specialist (CPS).[1] Father, who also had a significant history with the Department, indicated his desire to "get [their] baby back." L.S.A. was placed with the guardians of Mother's two older children.

¶4     The Department filed for emergency protective services (EPS), adjudication, and temporary legal custody (TLC) on December 5. Initially, the Department had reason to believe that ICWA might apply to the proceedings, so it petitioned to set the show cause hearing beyond the statutorily required 20 days to account for ICWA's additional notice

---

[1] Biological testing later confirmed that Father was L.S.A.'s biological parent.

2

requirements. The District Court granted EPS, set an EPS hearing for December 9 upon Mother's request, and set the show cause hearing for January 3, 2023.

¶5 Both parents appeared at the December 9 EPS hearing with counsel, though they each stated that they did not want to proceed with the EPS hearing. The District Court reminded Mother that he had presided over Mother's previous cases and that the time to move for substitution was running. Father asserted that most of the Department's allegations supporting its petition concerned Mother and stated again that he wanted L.S.A. placed in his care.

¶6 Almost a month later, at the January 3, 2023 show cause hearing, Mother had a similar conversation with the same District Court judge regarding his substitution or recusal. Father clarified that he was not requesting the judge's recusal, but Mother stated that she would prefer a different judge. Based on these representations, the judge recused. Another judge in the district assumed jurisdiction on January 25. On January 27, the District Court reset the show cause and adjudicatory hearing for March 1.

¶7 Late afternoon the day before the March 1 hearing, Mother moved unopposed to continue based on a newly identified conflict with her assigned counsel. The hearing was continued to April 12. Mother did not appear at the April 12 hearing and her new counsel reported that she had not made contact with Mother. Because Mother had not been properly served with notice, the District Court was required to reset the hearing until the Department could provide notice by publication. Regarding the already-extensive delay, Father's counsel noted on the record that even if he filed a motion to dismiss, the Department would

3

only refile and delay the proceedings further; therefore, he did not object. Father inquired about his request to have L.S.A. placed in his care, but the CPS explained that Father had not yet allowed a home visit, which was a requirement for placement. The District Court told Father to "[m]ake sure you make yourself available and do what you can. And if your request is that she be placed with you, you're going to have to demonstrate that that's a safe option, all right? [sic] So work with the Department."

¶8     Father's dedication to visitation was generally good throughout these initial delays, except for erratic visitation throughout March 2023 and some reticence to scheduling in the week after L.S.A.'s birth. Various CPSs advised Father that he would need to engage with the Department and offered to refer him for chemical dependency and mental health evaluations, but he refused drug testing or other services. These offers were repeated with subsequent continuances but Father consistently refused.

¶9     Mother was properly served in time for the rescheduled May 24 hearing, but her counsel moved to continue because Mother would be out of state. Father did not object. The District Court granted the motion and continued the hearing until June 7. Then, on June 6, the Department moved to continue the hearing because the CPS was traveling. The District Court continued the hearing until June 14 and then two days later, upon "motion of the State"—though no additional motion appears in the record—until July 12.

¶10     Finally, on June 23, Father moved to dismiss the Department's petition for adjudication and TLC on the grounds that his due process and statutory rights had been violated. According to the motion, Father understood the reasons for and consequences of

4

the previous continuances and did not object, but now felt that the latest continuance violated his right to a timely show cause hearing.

¶11 At the July 12 hearing, the District Court heard argument on Father's motion to dismiss. Father argued that he had not opposed the previous motions because he believed that the delay was not intended to disadvantage either parent but that he had nonetheless been prejudiced. The Department argued, as they do on appeal, that Father was not prejudiced because he had the opportunity to address the Department's consistent concerns with his parenting but failed to do so. The District Court found that each of the continuances was supported by good cause[2] and denied the motion based on Father's lack of objection and failure to show prejudice.

¶12 The District Court then heard testimony from numerous CPSs, hospital workers, and a Qualified Expert Witness[3] on the Department's petition. Father argued again that the Department should have placed L.S.A. with him because, other than potential suspected drug use, it had not identified any immediate safety risks if L.S.A. were placed with him. The District Court disagreed and granted the Department's petition, noting particularly

---

[2] The District Court did not specifically address the final continuance that moved the hearing from June 14 to July 12. It is unclear whether some additional motion is missing from the record or whether the District Court rescheduled sua sponte. When the District Court discussed the reasons for the continuances, it seemed to reference that the latest continuance was due to the CPS's unavailability, which was the subject of the Department's June 6 motion. Father does not raise any specific questions regarding this final continuance on appeal.

[3] Consistent with the requirements of ICWA, because one of two potential tribal affiliations had not yet been confirmed or denied, the matter was required to proceed as an ICWA case.

Father's general refusal to cooperate with the Department by submitting to drug testing or permitting a home visit for placement purposes.

¶13 A dispositional hearing was held on August 2 where the parents' respective treatment plans were discussed. Father had the proposed treatment plan for "a couple of months" and objected to the plan in its entirety. He denied having any of the substance abuse, domestic violence, mental health, or parenting issues that the plan purported to address. Father's counsel explained that Father was very engaged early on but had become frustrated with delays, leading to perceived non-compliance and lack of cooperation.

¶14 The CPS testified that Father's treatment plan was necessary based on his prior interactions with the Department regarding his other children. The Department's involvement in those cases was due to Father's known substance abuse. Allegedly, a plastic baggie with a white crystalline substance was found in the hospital room after L.S.A.'s delivery, renewing substance abuse concerns for both parents. Father had also previously undergone mental health evaluations but refused to disclose any record, the evaluation, or the result of the evaluation.

¶15 To address the Department's concerns, Father's treatment plan was developed around broad categories of basic parenting skills, chemical dependency, mental health issues, and unsafe or unstable housing. The plan required Father to, among several tasks, complete parenting classes, complete a chemical dependency evaluation, remain sober and comply with testing, complete a mental health evaluation, attend anger management classes, participate in individual therapy, and secure and maintain a safe home. The District

6

Court adopted and ordered both parents' treatment plans as proposed, both orally in the hearing and in a written order two days later.[4]

¶16 A permanency plan hearing was held on November 1. Father had been in jail due to probation violations since August, approximately four months, but had recently been released and reengaged with the Department, including consistent weekly visits. He requested a drug patch test, though he failed to enroll in testing, and asked for a family support team meeting which was ultimately held later in November. Also later in November, Father accepted a referral to Many Rivers Whole Health and accepted adult case management and mental health support. However, Father completely disengaged in December and left for Billings until mid-January 2024, when he returned to Great Falls. He resumed visitation until February, ostensibly when he was reincarcerated for violating his probation. When the CPS visited Father in jail following his arrest, Father told the CPS that he did not anticipate being released soon.

¶17 The District Court granted an extension of TLC following a hearing in February 2024. On March 11, the Department filed a petition for termination of parental rights (TPR) based on both parents' failure to successfully complete their treatment plans. A hearing was held on May 31. Father's probation officer testified to his lack of compliance with probation conditions, including requirements for a chemical dependency evaluation

---

[4] Due to clerical error, the treatment plans were not attached to the August order. The Department filed to amend the order to append the plans in February 2024, ahead of the hearing for extension of TLC, and Father formally objected. The District Court heard argument on Father's objection at the February hearing and overruled him, finding that the treatment plan was the exact same as provided to Father early in summer 2023 and formally ordered in August 2023 and that its omission from the record was merely administrative error.

and general issues with stability and itinerance. Reiterating much of her testimony from earlier hearings, the CPS then testified that Father had generally positive visitation with L.S.A. but that he consistently refused other services or referrals, especially related to substance abuse. The CPS testified that Father's most consistent period of engagement was in November 2023 when Father agreed to some mental health and case management services. However, even then, he became noncompliant immediately. The CPS explained that Father's repeated incarceration made housing referrals challenging. While he was incarcerated, Father sought a referral to a sober living facility, but they could not accept an application until he had a set release date from jail. The CPS stated that she did not believe Father could meet his own needs. However, despite his incarceration making consistent visitation difficult, Father regularly wrote to L.S.A. and reiterated his desire to parent.

¶18 The District Court granted the Department's TPR petition. It noted Father's failure to follow through with services and his general noncompliance, even in the time he was not incarcerated. In accordance with statute, the District Court determined that L.S.A. had been adjudicated a youth in need of care, that the statutory presumption based on time in foster care had arisen, and that Father had failed to comply with his treatment plan and the conduct or condition making him unfit to parent—in this case, Father's yet-undiagnosed mental or emotional illness or deficiency and his "lack of cooperation"—was unlikely to change within a reasonable time.

¶19 Father asserts that the District Court erred when it terminated his parental rights based on two main arguments. First, he contends that his due process rights were violated

by the 219-day delay before the show cause hearing. Second, he argues that the Department failed to provide reasonable efforts towards reunification during that period of delay—the majority of the time Father was not incarcerated during this case—and that the District Court errantly "focused solely" on Father's behavior during that period without accounting for the Department's lack of reasonable efforts.

¶20 A district court's decision to terminate parental rights is reviewed for abuse of discretion. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. A district court abuses its discretion when it acts "arbitrarily, without conscientious judgment, or in an unreasonable fashion that results in substantial injustice." *In re Z.N.-M.*, 2023 MT 202, ¶ 10, 413 Mont. 502, 538 P.3d 21.

¶21 We review a district court's findings of fact for clear error and its conclusions of law for correctness. *In re C.B.*, 2019 MT 294, ¶ 13, 398 Mont. 176, 454 P.3d 1195. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *In re C.B.*, ¶ 13.

¶22 The "natural parent's right to care and custody of a child is a fundamental liberty interest" triggering the protections of the Due Process Clause of the Fourteenth Amendment. *In re C.J.*, 2010 MT 179, ¶ 26, 357 Mont. 219, 237 P.3d 1282. "Fundamental fairness and due process require that a parent not be placed at an unfair disadvantage during the termination proceedings." *In re T.C.*, 2008 MT 335, ¶ 16, 346 Mont. 200, 194 P.3d

9

653. The key components comprising fundamentally fair proceedings are notice and an opportunity to be heard. *In re C.B.*, ¶ 18. This Court has plenary review over whether a parent was denied their right to due process. *In re C.B.*, ¶ 13.

¶23 Father's argument that the 219-day delay violated his statutory and due process rights was fully litigated when he made the same argument in his motion to dismiss, though he does not specifically appeal the denial of that motion. On appeal, he asserts that this delay "stole valuable time" when he was not incarcerated and "could have potentially engaged in services, demonstrated stability, and built a stronger bond with L.S.A." While true that the show cause hearing took place well outside the statutory guideline, the District Court found good cause for each of these continuances. It is not a requirement that Father object to each continuance to assert his rights, but without objections and the more extensive record that would have been developed if Father objected contemporaneously, it is difficult for this Court to conclude that the continuances were not supported by a showing of "substantial injustice." *See* § 41-3-432(1)(c), MCA. To wit, the record supports the District Court's conclusions that, for example, proceeding without Mother having notice of a hearing would have created substantial injustice, as would proceeding without giving time for ICWA notices or ensuring the appearance of a party's counsel or key witness. Thus, we cannot conclude that the District Court's decision to grant the continuances is unsupported by the record.

¶24 To prove that the delay violated Father's due process rights, he must "demonstrate how the outcome would have been different had the alleged due process violations not

occurred." *In re C.B.*, ¶ 18. The District Court found, and we agree, that the same resources were available to Father notwithstanding the delay. Both the District Court and the Department informed Father of steps that he would need to take to prove that he was a suitable placement for L.S.A., and the Department repeatedly testified that it offered the necessary referrals early on and renewed its offers with subsequent continuances. On appeal, Father states that he was "ready and willing to engage in the process from the outset of the case." This is true with respect to visitation and his desire to have L.S.A. placed with him. But Father was plainly unwilling to engage with the key requirements of proving his suitability to parent by obtaining a chemical dependency evaluation, demonstrating sobriety, maintaining stable housing, or allowing a home visit. The same resources and services were available to Father regardless of when the show cause hearing was ultimately held. Given his consistent refusal to address the Department's concerns throughout the proceedings, we cannot conclude that Father would have somehow engaged with services or shown he was an appropriate placement without the delay.

¶25 We turn next to Father's argument that the Department failed to provide reasonable efforts during the period of delay and that the District Court therefore erred in terminating his parental rights. A determination of reasonable efforts is not a separate requirement for termination, but it may be a predicate for determining whether a parent's conduct or condition is likely to change. *In re R.L.*, 2019 MT 267, ¶ 18, 397 Mont. 507, 452 P.3d 890.

¶26 Father was insistent and consistent throughout these proceedings that he did not have any issues negatively impacting his ability to parent. As discussed above, the CPS

11

testified repeatedly that Father was made aware of the Department's concerns and offered services and referrals throughout the period of delay—the very same concerns, services, and referrals that later became his treatment plan. The District Court also specifically told Father in April that he would need to engage with the Department. Given Father's strong resistance to addressing the very issues that created the Department's concerns, there were no *other* efforts that could have been provided during this time. "While the Department is required to 'diligently attempt to contact reluctant parents and engage them with services,' it is not required to endlessly pursue an unwilling parent who does not wish to be found with services the parent does not wish to receive." *In re A.M.G.*, 2022 MT 175, ¶ 28, 410 Mont. 25, 517 P.3d 149 (quoting *In re R.L.*, ¶ 22).

¶27    Nor did the District Court "focus solely" on Father's behavior during the delay. The timing of Father's repeated incarceration relative to when the treatment plan was ordered was unfortunate, and there were no real efforts towards reunification made while Father was in jail. Yet as the District Court orally noted, testimony during the TPR hearing showed that there was time from November to February when Father was not incarcerated when he could have taken steps towards demonstrating sobriety, beginning parenting education, or obtaining a chemical dependency evaluation. Instead, he disengaged entirely and left for Billings.

¶28    Termination of parental rights is appropriate when clear and convincing evidence establishes that the child is an adjudicated youth in need of care and "(i) an appropriate treatment plan that has been approved by the court has not been complied with by the

12

parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. We understand that Father's noncompliance was borne of his feeling that L.S.A. was unfairly and improperly removed from the beginning. Unfortunately, this consistent noncompliance—despite the Department's reasonable efforts—ultimately created substantial, credible evidence that Father was unlikely to change in a reasonable time. Accordingly, the District Court did not abuse its discretion in terminating Father's parental rights.

¶29 Affirmed.

¶30 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ JIM RICE